# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE,<br><br>               Plaintiff,<br><br>v.<br><br>SYRACUSE UNIVERSITY,<br>JOHN WILDHACK, and<br>JOHN DESKO,<br><br>               Defendants. | Civ. No.  5:21-CV-977 (GTS/ATB)<br><br>**COMPLAINT**<br><br><br><br><br><br><br><br>Jury Trial Demanded |

TABLE OF CONTENTS

INTRODUCTION .................................................................................................................3

PARTIES ...........................................................................................................................5

JURISDICTION AND VENUE ..........................................................................................6

PLAINTIFF'S MOTION FOR PERMISSION TO PROCEED USING A PSUEDONYM ..........7

GENERAL ALLEGATIONS .............................................................................................7

I.      Defendant SU Actively Recruited Scanlan and Thereafter is Put on Direct Notice of His Potential for Violence Against Others ........................................ 7

II.     A Pattern of Sexual Harassment between Scanlan and Plaintiff Emerges........... 8

III.    Plaintiff Reports Scanlan's Conduct and Puts Defendant SU on Notice of Risk of Further Domestic Violence.................................................................. 10

IV.     Defendant SU Violates Its Own Policies In Lifting the No Contact Order Despite Knowledge of Domestic Violence and Inadequate Investigation.................... 13

V.      Plaintiff is Subjected to Domestic Violence and Assaulted in A SU Dormitory.................................................................................................... 16

VI.     SU DPS Investigates the Scanlan Assault In A Deliberately Indifferent and Potentially Dangerous Manner...................................................................... 18

VII.    Defendant SU's Lack of Prosecution for Damage to University Property........... 25

VIII.   Defendant SU's Lack of Follow Up And Lack of Independent Investigation...... 27

IX.     Defendant SU's Decision to Reinstate Scanlan After A Few Days of Suspension 29

X.      Plaintiff's Further Communications with SU's Title IX Office...................... 30

XI.     Plaintiff's Parents' Communications with Defendant SU & Defendant Wildhack.................................................................................................... 34

XII.    Plaintiff Returns to SU Campus..................................................................... 37

XIII.   SU Men's Lacrosse Players Oppose Scanlan Rejoining the Team And Media Attention Grows........................................................................................... 38

XIV.    Scanlan is Arrested As Men's Lacrosse Team Raises "One Love" Awareness.... 39

XV.     Defendant Wildhack Celebrates Defendant Desko As He Announces His Retirement.................................................................................................. 42

XVI.    Plaintiff Learns She is No Longer Welcome at SU......................................... 43

XVII.   Defendant SU's Title IX Policy Is Meant to Prevent & Redress Sexual Harassment................................................................................................ 52

XVIII.  Defendant SU's Failures in Responding to Plaintiff's Ongoing Sexual

Harassment…………………………………………………………………… 53

XIX.   Defendant SU's Deliberate Indifference, Retaliation and Intimidation………… 62

XX.   Defendant SU's History of Inadequately Addressing Sexual Harassment and Title IX Issues………………………………………………………………… 63

XXI.   Notice of Long-Standing Issues Within Defendant SU's Athletics Department... 66

XXII.   Defendant SU's Systemic Title IX Compliance Issues and Prevalence of On-Campus Sexual Violence Persists……………….…………………………… 70

LEGAL CLAIMS ....................................................................................................71

COUNT I: SEX DISCRIMINATION IN VIOLATION OF TITLE IX - 20 U.S.C. 1681(a) AGAINST DEFENDANT SU (Deliberate Indifference to Plaintiff's January 2021 Reports of Sexual Harassment)…………………………………………………… 71

COUNT II: SEX DISCRIMINATION IN VIOLATION OF TITLE IX – 20 U.S.C. 1681(a) AGAINST DEFENDANT SU (Deliberate Indifference to Scanlan Assault and Incident of Sexual Harassment)………………………………………………………………... 74

COUNT III: SEX DISCRIMINATION IN VIOLATION OF TITLE IX - 20 U.S.C. 1681(a) AGAINST DEFENDANT SU (Hostile Environment)………………………... 77

COUNT IV: RETALIATION IN VIOLATION OF TITLE IX - 20 U.S.C. 1681(a) AGAINST DEFENDANT SU………………………………………………………... 78

COUNT V: NEGLIGENCE AGAINST DEFENDANT SU, DEFENDANT DESKO, AND DEFENDANT WILDHACK…………………………………………………… 79

COUNT VI: NEGLIGENCE (*Vicarious Liability/Respondeat Superior*) AGAINST DEFENDANT SU…………………………………………………………………… 81

COUNT VII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT SU, DEFENANT DESKO, AND DEFENDANT WILDHACK……….. 84

RELIEF REQUESTED.............................................................................................85

DEMAND FOR TRIAL BY JURY ..........................................................................86

Plaintiff Jane Doe, by and through her attorney of record, Calcaterra Pollack LLP, alleges the following as her Complaint against Defendant Syracuse University ("SU") and related individuals:

## INTRODUCTION

1.   This is a civil rights case brought by SU student Jane Doe, who suffered extended periods of sexual harassment at Defendant SU which culminated in the late evening of April 17, 2021, and the early morning hours of April 18, 2021. At that time, Plaintiff was attacked by SU Men's Lacrosse Player Chase Scanlan ("Scanlan"), who confronted Plaintiff in a fit of jealousy, smashed her cell phone, and squeezed the breath from her lungs to the point that Plaintiff feared for her life (the "Scanlan Assault").

2.   When SU's Department of Public Safety ("SU DPS") Officers initially responded to the Scanlan Assault, they subjected Plaintiff to hostile and problematic questioning in front of Scanlan, disregarding accepted concepts of domestic violence and Plaintiff's expressed concerns for her own safety and privacy while failing to ascertain crucial facts. Despite Scanlan admitting to crimes of domestic violence, SU DPS made no arrests, allowed Scanlan to leave the scene, and left Plaintiff alone with no supervision for the remainder of the day and upon her return to campus after the Scanlan Assault.

3.   What happened to Plaintiff arose from a set of circumstances that should have alerted Defendant SU to the fact that one of its student athletes was in extreme peril of being seriously harmed or killed as a result of domestic violence. The Scanlan Assault was the avoidable conclusion of a chain of sexual harassment and domestic violence that included animal abuse, stalking, reproductive coercion and property damage, all of which Plaintiff had directly reported to both a member of the SU Women's Lacrosse Team Coaching Staff and a SU Title IX Coordinator in January 2021.

4.   Despite Defendant SU possessing direct knowledge of Scanlan's domestic violence, stalking, and other conduct which amounted to the classic warning signs of an abusive and coercive relationship, his suspension from the SU Men's Lacrosse Team lasted less than a week.

5.   "Just so you know, he's not getting arrested," Plaintiff's family was told by SU Deputy General Counsel Gabe Nugent as they attempted to understand why Scanlan was allowed to resume playing lacrosse despite a documented history of violent and abusive conduct, while Plaintiff remained off-campus out of fear for her safety, limiting her access to educational and student-athlete programs and activities.

6.   Defendant SU's handling of the events was unresponsive, inapt and inept as it put the onus of protecting students – including Plaintiff – from Scanlan entirely on Plaintiff's shoulders. Defendant SU deliberately dragged its feet on investigating Scanlan as the Men's Lacrosse Team closed out its season while local law enforcement seemed completely unaware of the Scanlan Assault crimes until around a week later.

7.   Despite, or spurred on by, Defendant SU's negligence, members of SU Men's Lacrosse Team brought attention to the lack of accountability. Coinciding with the additional press coverage of the SU Men's Lacrosse Team's heroic stance on domestic violence came official confirmation on April 28, 2021 that the Syracuse Police Department and the Onondaga County District Attorney were investigating the events of the Scanlan Assault. Scanlan was arrested on May 7, 2021.

8.   In 2015, Defendant SU was deemed "one of the most dangerous places for women in America". Defendant SU's history of inadequately addressing sexual harassment and student safety, particularly within the Athletics Department, should have put Defendant SU and its staff on notice that additional training, supervision, and leadership was needed. Recent litigation under the New York Child Victims Act alleges that Defendant SU did not properly vet: 1) a residential

advisor and assistant coach who for years used SU facilities to sexually assault high school and college students and 2) a basketball coach who had allegedly sexually assaulted multiple minors prior to being hired by Defendant SU. Plaintiff's lawsuit is not even the most recent example of Defendant SU's disregard for student safety and civil rights, as a recent media report detailing years of sexual harassment by SU's now former Women's Basketball Head Coach has led to the resignation and/or termination of several Defendant SU employees and questions about a culture of "winning at all costs" at the SU Athletic Department.

9.   Since the 9th grade, Plaintiff had dreamed of playing Division I lacrosse at Defendant SU. She arrived on campus as a model student-athlete, with academic and community service accolades. Plaintiff had been named as one of the top 100 regional girl lacrosse players and an all-county lacrosse player; had received all-county and all-state honors for a separate sport; had been awarded an outstanding senior athlete award; and was a member of the National Honor Society and the Foreign Language Society, amongst others. As a result of Defendants' negligence and deliberate indifference, she was continuously exposed to Scanlan's violent and abusive conduct and traumatized after suffering "institutional betrayal" at the hands of Defendants.

10. Plaintiff brings this action against Defendant SU and related parties for discrimination on the basis of sex in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. 1681 and related state law claims to vindicate her statutory right to equal educational opportunities.

## PARTIES

11. Plaintiff is a 20-year-old student who at all times pertinent hereto, was a student at Defendant SU and a member of the SU Women's Lacrosse Team.

12. At all times pertinent hereto, Plaintiff resided on SU campus at 160 Small Road, Syracuse, New York 13210, which is supervised and managed by SU as part of SU's South Campus.

13. Defendant SU is a private university and has its principal place of business at 900 South Crouse Ave., Syracuse, New York 13244.

14. Defendant SU, at all times relevant to this Complaint, received federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a) and is therefore subject to Title IX.

15. Defendant John Wildhack ("Defendant Wildhack") is a natural person and is, and at all material times was, the Director of Athletics for SU and an SU employee.

16. Upon information and belief, Defendant Wildhack is a resident of the state of New York whose last known business address is 900 South Crouse Ave., Syracuse, New York 13244.

17. Defendant John Desko ("Defendant Desko") is a natural person and, at all times relevant to this Complaint, was the Head Men's Lacrosse coach at SU and an SU employee.

18. Upon information and belief, Defendant Desko resides in New York.[1]

## JURISDICTION AND VENUE

19. This Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's New York state law claims pursuant to 28 U.S.C. § 1367, as the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

20. This Court is an appropriate venue pursuant to 28 U.S.C. § 1391. The Defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claims occurred in this district.

---

[1] Defendant Wildhack and Defendant Desko are hereinafter collectively referred to as the "Individual Defendants". The Individual Defendants and Defendant SU are hereinafter collectively referred to as the "Defendants".

### PLAINTIFF'S MOTION FOR PERMISSION
### TO PROCEED USING A PSEUDONYM

21. Plaintiff has filed this Complaint using a pseudonym in accordance with the applicable law in this Circuit.

22. Concomitant with the filing of this Complaint, Plaintiff filed a motion for permission to proceed using a pseudonym.

### GENERAL ALLEGATIONS

I.   **Defendant SU Actively Recruited Scanlan and Thereafter is Put on Direct Notice of His Potential for Violence Against Others**

23.  Chase Scanlan , at all times relevant to this Complaint, was a student enrolled at SU and member of the Men's Lacrosse team at SU.

24. In or around June 2019, following one year of playing for the Loyola University Men's Lacrosse Team, Scanlan transferred out of Loyola University.   Scanlan claimed that his transfer was due to a lack of team atmosphere.[2]

25. Scanlan was a "highly coveted recruit" for SU, and Defendant Desko, then Head Coach of SU's Men's Lacrosse Team, took efforts to recruit Scanlan.[3]

26. These efforts included Defendant Desko using the "ace up his sleeve" by offering SU's prestigious No. 22 jersey, which had been worn by previously lauded players, to Scanlan.[4]

27. On September 12, 2020, Scanlan engaged in a physical altercation with other members of the SU Men's Lacrosse Team, striking two of his teammates in the face.

---

[2] *See This Feels Right: Chase Scanlan at Home at Syracuse*, USA Lacrosse Magazine, https://usalaxmagazine.com/college/men/this-feels-right-chase-scanlan-at-home-at-syracuse (last visited Aug. 6, 2021).
[3] *Id.*
[4] *Id.*

28. This incident was reported to the entire SU Men's Lacrosse Team Coaching Staff, including Defendant Desko, and Scanlan was temporarily suspended from the SU Men's Lacrosse Team.   Defendant SU, at least through its employees Defendants Desko and Wildhack, was therefore on notice, at least as early as September 2020, of Scanlan's propensity for violence.

## II.    A Pattern of Sexual Harassment between Scanlan and Plaintiff Emerges

29. Plaintiff and Scanlan started dating in February 2020, but then broke up and entered an on-again-off-again relationship pattern indicative of domestic violence and related abusive behaviors.

30. Plaintiff suffered several forms of domestic violence at the hands of Scanlan and observed additional circumstances that caused her concern for her safety. These included:

    a) Scanlan shoving Plaintiff to the ground in the summer months of 2020;
    b) Scanlan aggressively monitoring Plaintiff's personal belongings to prevent Plaintiff from controlling her reproductive health;
    c) Scanlan's stalking of Plaintiff, including entering her apartment and bedroom without authorization on SU premises in the middle of the night, to see where she was sleeping and if anyone else was with Plaintiff;
    d) Scanlan's practice of punching and hitting his puppy when his puppy relieved himself inside Scanlan's dormitory apartment on SU premises;
    e) Scanlan's refusal to take his puppy to the veterinarian when the puppy unknowingly ate rat poison;
    f) Scanlan's suggestion that he would shoot his puppy in the head rather than pay for the veterinarian bills;
    g) Scanlan's selling of marijuana to SU students;
    h) Scanlan's stealing of Plaintiff's property, including her mattress topper; and
    i) Scanlan's crushing of Plaintiff's bracelet, valued at $600 and of significant sentimental value to Plaintiff, in front of her, which he then handed back to her damaged.

31. Statistics, studies, and reports, and widely reported incidents of injury and death, have for decades demonstrated that domestic violence is an unfortunately common occurrence, especially in the instance of college women.

32. In 2000, the U.S. Department of Justice released a study showing that 13% of college women experience stalking. This was the highest rate compared to other groups of women. Of those stalked, 42% were stalked by a boyfriend or ex-boyfriend.[5]

33. A 2011 College Dating Violence and Abuse Poll demonstrated the documented risk of domestic violence in the college setting and reported that:

    a) 43% of college women report experiencing violent and abusive dating behaviors including physical, sexual, verbal or controlling abuse through technology (i.e. harassment via unwanted phone calls/text messages).

    b) Nearly 1 in 3 college women (29%) say they've been in an abusive dating relationship.

    c) Among those who experienced relationship abuse, 70% of college students were not aware at the time that they were in an abusive relationship and 42% did not tell anyone about it. [6]

34. Defendant SU should therefore have reasonably foreseen that its students, and especially its female students, were at risk of domestic violence and abuse.

35. Plaintiff continued to stay in contact with Scanlan between the period of February 2020 to January 2021. As early as February 16, 2020, Scanlan cheated on Plaintiff.  Plaintiff's continuation of the relationship, despite Scanlan's threatening and abusive behavior described above, is common behavior by individuals in violent relationships.[7]

36. The abusive relationship and sexual harassment were such that Plaintiff went from a Dean's List student in the Spring 2020 Semester, to failing a class in the Fall 2020 Semester. Plaintiff emailed her professor explaining that she had been attempting to leave an abusive relationship for

---

[5] *See* Fisher, B. Cullen, T., Turner, M. (2000), *The Sexual Victimization of College Women*. U.S. Department of Justice, *available at* https://www.ojp.gov/pdffiles1/nij/182369.pdf.

[6] *See 2011 College Dating Violence and Abuse Poll*, Knowledge Networks, *available at* https://www.loveisrespect.org/pdf/College_Dating_And_Abuse_Final_Study.pdf.

[7] *See The Challenge of Title IX Responses to Campus Relationship and Intimate Partner Violence: The 2015 Whitepaper*, Association of Title IX Administrators, https://cdn.atixa.org/website-media/o_atixa/wp-content/uploads/2012/01/18122546/Challenge-of-TIX-with-Author-Photos.pdf at 10 ("In [intimate partner violence] cases, leaving the relationship is the most unsafe time for victims. Many victims try multiple times to leave before successfully doing so."). *See also infra* notes 44-46 and accompanying text.

the majority of the semester. To date, Plaintiff's grade has not been changed, which impacted her transfer out of Defendant SU.

37. By January 2021, the situation deteriorated to the point that Plaintiff sought assistance from Defendant SU.  As described below, by early January 2021, Defendant SU was on notice of Scanlan's threatening, violent and abusive behavior, especially in relation to Plaintiff.

### III.   Plaintiff Reports Scanlan's Conduct and Puts Defendant SU on Notice of Risk of Further Domestic Violence

38. On January 3, 2021, Plaintiff texted a SU's Women's Lacrosse Team Assistant Coach ("Assistant Coach") and requested a meeting.

39. On January 4, 2021, Plaintiff and Assistant Coach met at a Starbuck's Café ("Assistant Coach Meeting").

40. At the Assistant Coach Meeting, Plaintiff communicated her concerns regarding Scanlan and advised Assistant Coach about specific circumstances, including:

    a)  Scanlan's physical assault of SU students, including a member of the SU Men's Lacrosse Team;

    b)  Scanlan's stalking of Plaintiff, including entering her apartment and bedroom without authorization on SU premises in the middle of the night, to see where she was sleeping and if anyone else was with Plaintiff;

    c)  Scanlan aggressively monitoring Plaintiff's personal belongings to prevent Plaintiff from controlling her reproductive health;

    d)  Scanlan shoving Plaintiff to the ground in the summer months of 2020;

    e)  Plaintiff feeling threatened by Scanlan's behavior;

    f)  Scanlan's practice of punching and hitting his puppy when his puppy relieved himself inside Scanlan's dormitory apartment on SU premises;

    g)  Scanlan's refusal to take his puppy to the veterinarian when the puppy unknowingly ate rat poison;

    h)  Scanlan's suggestion that he would shoot his puppy in the head rather than pay for the veterinarian bills;

    i)  Stealing of Plaintiff's property, including her mattress topper;

    j)  Scanlan's crushing of Plaintiff's bracelet, valued at $600 and of significant sentimental value to Plaintiff, in front of her, which he then handed back to her; and

    k)  Scanlan's selling of marijuana to SU students.

41. At the Assistant Coach meeting, Assistant Coach made the following observations regarding Scanlan: "he's crazy, he shouldn't be on campus, he's dangerous".

42. Later that same day, on January 4, 2021, in response to the Assistant Coach Meeting, Plaintiff's Mother spoke with Assistant Coach ("Assistant Coach Parental Call").

43. During the Assistant Coach Parental Call, Assistant Coach advised Plaintiff's Mother that she:

     a)  would meet Plaintiff for check-ins with Plaintiff;
     b)  would have Plaintiff's friends check in on Plaintiff;
     c)  would make sure that Plaintiff was safe; and
     d)  would offer Plaintiff to stay with her.

44. After the Assistant Coach Call, Assistant Coach advised her superior, SU Women's Lacrosse Head Coach Gary Gait ("Coach Gait") of the conversation with Plaintiff. Coach Gait in turn notified his supervisor, Deputy Athletics Director/Senior Woman Administrator Kimberly Keenan-Kirkpatrick ("Deputy Athletics Director Keenan-Kirkpatrick").

45. On January 5, 2021, Assistant Coach called Plaintiff and informed her that she had discussed Plaintiff's disclosures with one of the other coaches. Assistant Coach informed Plaintiff that the information Plaintiff had disclosed regarding Scanlan had been forwarded to the SU Title IX Office.

46. On January 5, 2021, Plaintiff received an email from SU's Office of Equal Opportunity, Inclusion, and Resolution Services ("SU's Title IX Office") containing a copy of SU's Sexual Harassment Prevention Policy, information about resources on campus (safety escorts, counseling, etc.), and information about the process for filing informal and formal complaints. This email also mentioned that Plaintiff would be assigned a Case Manager from the Dean of Students Office.

47. Plaintiff corresponded via email with Gina Kelepurovski, SU Equal Employment Opportunity and Title IX Case Coordinator ("SU Title IX Coordinator Kelepurovski"), to set up a video call and further discuss Plaintiff's options.

48. On January 8, 2021, Plaintiff met with SU Title IX Coordinator Kelepurovski via video call.

49. During said call, Plaintiff advised SU Title IX Coordinator Kelepurovski of the below circumstances:

    a) Scanlan's physical assault of SU students, including a member of the SU Men's Lacrosse Team;
    b) Scanlan's stalking of Plaintiff, including entering her apartment and bedroom without authorization on SU premises in the middle of the night, to see where she was sleeping and if anyone else was with Plaintiff;
    c) Scanlan aggressively monitoring Plaintiff's personal belongings to prevent Plaintiff from controlling her reproductive health;
    d) Scanlan shoving Plaintiff in the summer months of 2020;
    e) Plaintiff feeling threatened by Scanlan's behavior;
    f) Scanlan's practice of punching and hitting his puppy when his puppy relieved himself inside Scanlan's dormitory apartment on SU premises;
    g) Scanlan's refusal to take his puppy to the veterinarian when the puppy unknowingly ate rat poison;
    h) Scanlan's suggestion that he would shoot his puppy in the head rather than pay for the veterinarian bills;
    i) Stealing of Plaintiff's property, including her mattress topper;
    j) Scanlan's crushing of Plaintiff's bracelet, valued at $600 and of significant sentimental value to Plaintiff, in front of her, which he then handed back to her; and
    k) Scanlan's selling of marijuana to students.

50. During the January 8, 2021 call, SU Title IX Coordinator Kelepurovski advised Plaintiff that Plaintiff could seek a "No Contact Order" or file a formal complaint.

51. Around January 20, 2021, Plaintiff emailed SU Title IX Coordinator Kelepurovski to confirm that Plaintiff wanted a No Contact Order against Scanlan.

52. "In order to protect the community", the SU Title IX Coordinator has the discretion to file a formal complaint on behalf of Defendant SU in the absence of a formal complaint by the harmed

student in order to investigate and adjudicate serious incidents.[8] Compared to a scenario where an aggrieved student files a formal complaint herself, a formal complaint filed on behalf of SU requires less involvement from the aggrieved party.

53. At no point during the January 2021 emails and calls with SU's Title IX Office was Plaintiff informed about the possibility of SU's Title IX Office independently investigating Scanlan by filing a complaint on behalf of SU.

54. On January 22, 2021, Plaintiff received her copy of the mutual No Contact Order ( "January 22, 2021 No Contact Order"). Per SU's policy to issue mutual no contact orders, said orders were issued to both Plaintiff and Scanlan barring them from contacting each other.

55. On or around January 25, 2021, Plaintiff's Mother texted Assistant Coach to notify her that Plaintiff would be returning to SU for the Spring Semester.

56. On January 27, 2021, Plaintiff returned to SU for the Spring 2021 Semester.

## IV.   Defendant SU Violates Its Own Policies In Lifting the No Contact Order Despite Knowledge of Domestic Violence and Inadequate Investigation

57. In 2015, the Association of Title IX Administrators ("ATIXA") published a white paper titled *The Challenge of Title IX Responses to Campus Relationship and Intimate Partner Violence*. In discussing emerging best practices, ATIXA advised that in cases of domestic violence, "leaving the relationship is the most unsafe time for victims" and that "[m]any victims try multiple times to leave before successfully doing so."[9]

---

[8] *See Procedures for Responding to Reports of Student Violations of the Sexual Harassment, Abuse, and Assault Prevent Policy*, Syracuse University, https://policies.syr.edu/policies/university-governance-ethics-integrity-and-legal-compliance/sexual-harassment-abuse-and-assault-prevention/student-procedures/ (last accessed Aug. 26, 2021).

[9] *See The Challenge of Title IX Responses to Campus Relationship and Intimate Partner Violence: The 2015 Whitepaper*, ATIXA, https://cdn.atixa.org/website-media/o_atixa/wp-content/uploads/2012/01/18122546/Challenge-of-TIX-with-Author-Photos.pdf at 10.

58. SU's Sexual Harassment, Abuse, and Assault Prevention Policy ("SU's Title IX Policy)
includes a "Student Bill of Rights for cases involving Sexual or Relationship Violence or
Harassment" which states that under New York's Enough is Enough sexual misconduct prevention
law, all student complainants and respondents in cases involving sexual harassment or assault have
the right to, in pertinent part:

> …
> Have disclosures of Dating or Domestic Violence, Stalking, Sexual Assault, and
> other forms of Sexual Harassment treated seriously;
> …
> Be treated with dignity and to receive from the institution courteous, fair, and
> respectful health care and counseling services, where available.

59. Section 4.5 of SU's Student Conduct System Handbook ("SU Handbook") states that
Temporary No Contact Orders may be issued by either the Department of Public Safety, the Office
of Student Living, or the Title IX Officer "as a temporary directive to prohibit communication to,
or among, designated students when there is reason to believe that continued contact is not in the
best interest of the involved students to promote their safety and security, or to prevent future
negative interactions between the students." SU's Student Handbook further explains that "No
Contact Orders will not be considered for removal or amendment if all elements of the written
appeal are not addressed *or if there is evidence of the potential for future negative incidents
between listed parties*." Section 4.10 (emphasis added).

60.  After returning to SU's campus, Plaintiff, feeling a mix of confusion, guilt, and coercion
as a result of manipulation by Scanlan, initiated the process to have the January 22, 2021, No
Contact Order removed by notifying the Title IX Office of that fact via online link.  This was
typical behavior for an individual in an abusive relationship – indeed, it is common for individuals

in such relationships to retract allegations of abuse and/or claim a relationship is no longer abusive, when in fact it is.[10]

61. On March 7, 2021, Plaintiff's Mother, worried for Plaintiff's safety, texted Assistant Coach to request she check in on Plaintiff.

62. On or around the first week of March 2021, Plaintiff received a phone call from an employee of SU's Title IX Office regarding Plaintiff's request to remove the January 22, 2021 No Contact Order.

63. Despite the requirements of SU's Title IX Policy and Section 4.10 of the SU Student Handbook, the SU Title IX Office employee only asked Plaintiff questions sufficient to confirm that Plaintiff still wanted the No Contact Order removed and whether Plaintiff felt safe.

64. On March 8, 2021, Plaintiff was informed via email that the January 22, 2021 No Contact Order had been rescinded.

65. Throughout the time that Plaintiff applied for recission of the No Contact Order, Defendant SU failed to advise Plaintiff that she may be a domestic violence victim, failed to offer directed assistance and counseling related thereto, failed to determine what, if any, circumstances had changed that indicated that there was a reduced potential for future negative incidents, and failed to determine if Plaintiff was truly safe from Scanlan.

66. As discussed above, Defendant SU knew or should have known that it is common for women in abusive relationships to retract allegations of abuse and/or claim a relationship is no

---

[10] *See The Challenge of Title IX Responses to Campus Relationship and Intimate Partner Violence: The 2015 Whitepaper*, Association of Title IX Administrators, https://cdn.atixa.org/website-media/o_atixa/wp-content/uploads/2012/01/18122546/Challenge-of-TIX-with-Author-Photos.pdf at 9-10 (discussing the challenges with No Contact orders on campus, recommending campus officials "[t]ake protective steps if victim is not ready to leave abusive environment" and explaining that "[m]any victims try multiple times to leave before successfully doing so."). "Once victims are brave enough to come forward, some quickly regret doing so. They often experience mixed feelings about reporting the abuse of an intimate partner….More worrying, they can be pressured to recant by their abusers once the abusers find out that their partners have told authorities about the abuse." *See id.* at 12.

longer abusive, when in fact it is.  Accordingly, Defendant SU should not have lifted the January 22, 2021 No Contact Order simply because Plaintiff requested it be lifted, without taking further steps to ensure her safety.

67. Upon information and belief, despite Plaintiff's disclosures of Scanlan's animal abuse, fighting with teammates, and multiple forms of sexual harassment and reproductive coercion, Defendant SU did not open an independent investigation against Scanlan, its leading men's lacrosse player.

## V.    Plaintiff is Subjected to Domestic Violence and Assaulted in an SU Dormitory

68. On the night of Saturday, April 17, 2021, while Plaintiff was in her dormitory apartment on South Campus and using her cell phone (the "Cell Phone") for a video call with another SU (male) student, Plaintiff observed Scanlan was outside her apartment.

69. Based on past incidents of verbal abuse and control, Plaintiff feared how Scanlan would react if he learned that Plaintiff had been on a video call with another male SU student and put the Cell Phone in her pocket before opening her apartment door to Scanlan.

70. Scanlan asked Plaintiff to whom she had been speaking with and told Plaintiff to give the Cell Phone to him.

71. Plaintiff distracted Scanlan by directing him to another part of the apartment by saying the Cell Phone was charging in Plaintiff's bedroom. Plaintiff then locked herself in the bathroom of her apartment and began deleting details from the Cell Phone that would have angered Scanlan.

72.  Scanlan began pounding and kicking the bathroom door while yelling for Plaintiff to let him into the bathroom.

73. After Plaintiff deleted details of the earlier video call, Plaintiff unlocked the bathroom door. As Scanlan pushed the bathroom door open, Plaintiff was pushed to the ground by said door.

74. During these events, the apartment wall near the bathroom was damaged leaving a large hole in the wall.  As a result of her trauma, Plaintiff cannot recall at this time exactly what caused the hole in the wall.

75. Scanlan grabbed the Cell Phone and asked Plaintiff what she deleted.

76. Scanlan dropped the Cell Phone into the toilet.

77. Plaintiff removed the Cell Phone from the toilet, and Scanlan grabbed the Cell Phone from Plaintiff's hand.

78. Scanlan answered a phone call to the Cell Phone from Plaintiff's roommate, who was asking to be let into the apartment.

79. Scanlan let Plaintiff's roommate into the apartment but prevented her from going into the bathroom to check on Plaintiff.

80. Scanlan then left the apartment with the Cell Phone and walked to his apartment, located at 101 Lambreth Lane, Syracuse, New York, which was also maintained by Defendant SU and only a few buildings away from Plaintiff's apartment.

81. Plaintiff followed Scanlan to retrieve the Cell Phone from him.  Scanlan began yelling at Plaintiff, again asking Plaintiff to whom she had been speaking with and threw the Cell Phone to the ground in a parking lot, shattering the screen.

82. Plaintiff picked up the Cell Phone and observed that the Cell Phone's screen had been removed by the damage. Plaintiff followed Scanlan, yelling that he should buy her a new phone.

83. The verbal argument continued at Scanlan's apartment, and Scanlan again took the Cell Phone from Plaintiff and threw it against the apartment floor, further damaging the Cell Phone.

84. Plaintiff, in anger over the destruction of the Cell Phone, tried to strike Scanlan. At that time, Plaintiff was 19 years old, weighed approximately 120 pounds and was approximately 5 feet

and 6 inches tall. Scanlan was 21 years old, weighed approximately 175 pounds and was approximately 6 feet tall.

85. Scanlan caught Plaintiff's arm, spun her as they fell on his bed, and then restricted Plaintiff by restraining Plaintiff's legs with his own legs and squeezed her torso with his arms to the point that Plaintiff had difficulty breathing and was crying out from the pain.

86. During the time that Scanlan was squeezing Plaintiff, Plaintiff had difficulty breathing and feared that Scanlan would kill her.

87. Scanlan released Plaintiff.

88. Plaintiff remained on the bed crying and experiencing pain and told Scanlan she thought he broke her ribs.

89. Plaintiff was too afraid of Scanlan, and too traumatized by his conduct, to call 911. In addition, because of the damage Scanlan caused to the Cell Phone, Plaintiff did not have the ability to call 911.

## VI.   SU DPS Investigates the Scanlan Assault In A Deliberately Indifferent and Potentially Dangerous Manner

90. The Cell Phone was rendered inoperable as a result of Scanlan's conduct, described above.

91. On the morning of Sunday, April 18, 2021, Plaintiff's Sister and Mother learned that Plaintiff's apartment wall had been damaged.  Plaintiff's Sister and Mother tried frantically to contact Plaintiff, but were unable to do so, since Scanlan had rendered the Cell Phone inoperable. Due to Plaintiff's history with Scanlan, Plaintiff's Mother contacted SU Assistant Coach to notify her that Plaintiff was unaccounted for.

92. SU Assistant Coach notified Associate Athletic Trainer Kathleen Cheney, who in turn contacted Joseph Paul Hernon, Director of SU's Department of Emergency Management. The SU

Department of Emergency Management resides within the SU Department of Public Safety ("SU DPS")

93. Associate Athletic Trainer Cheney also notified other officials within the SU Athletics Department, including Roy Simmons III ("Simmons"), SU's Director of Operations for the Men's Lacrosse Team.

94. During the morning of Sunday, April 18, 2021, Scanlan and Plaintiff had gone to the Apple Store located at the Destiny Mall in Syracuse to attempt to obtain a new phone for Plaintiff.

95. At the Apple Store the employee working with Scanlan and Plaintiff looked at the Cell Phone in confusion and asked Scanlan and Plaintiff how the Cell Phone ended up in such a condition.

96. Scanlan responded to the Apple Store Employee that the Cell Phone had been run over.

97. Scanlan remarked, "We don't need this anymore," took the Cell Phone from Plaintiff, and handed it to the Apple Store employee.

98. Scanlan was driving Plaintiff in his vehicle after the visit to the Apple Store when he received a phone call from ("Simmons") on his cell phone.

99. Simmons asked Scanlan if he was with Plaintiff.

100. Scanlan passed his phone to Plaintiff so that Simmons could speak with Plaintiff.

101. Defendant Simmons asked Plaintiff if it was true that her cell phone had been broken.

102. Plaintiff advised Simmons that her phone was broken.

103. Simmons told Plaintiff that Defendant SU was searching for Plaintiff, and gave Plaintiff a phone number for Joseph Paul Hernon, Director of SU's Department of Emergency Management, for Plaintiff to call and confirm that she was accounted for.

104.  Simmons did not ask Plaintiff how she was or if she was hurt, frightened or in any way in danger.

105.  Plaintiff then called SU's Department of Emergency Management, as instructed by Simmons.

106.  The SU personnel to whom Plaintiff spoke with at SU's Department of Emergency Management summarily asked Plaintiff a single question about her status and asked no further questions as to Plaintiff's state of mind, fear, apprehension, or location, nor did they offer any counseling or assistance.

107.  Scanlan and Plaintiff returned to the SU South Campus apartments, where SU DPS personnel were present and interviewing one of Plaintiff's roommates.

108.  Prior to Scanlan and Plaintiff's return to SU South Campus apartments, Plaintiff's roommate had photographed the damage to a hallway wall inside the apartment.

109.  SU DPS personnel on scene included several officers including Detective Michael Toia.

110.  There were no members of the Syracuse Police Department present at the scene.

111.  Upon information and belief, no notification was made to the Syracuse Police Department prior to or following DPS personnel responding to the domestic incident call.

112.  At approximately 12:15 PM EST that day, members of SU DPS interviewed Plaintiff and Scanlan in the parking lot of the SU South Campus apartments outside of Plaintiff's residence.

113.  Despite having reason to believe that a domestic altercation had occurred between Scanlan and Plaintiff, SU DPS began questioning Plaintiff in open view, and within ear shot, of Scanlan.

114.  A female SU DPS officer ("Female SU DPS Officer") began questioning Plaintiff about what transpired between Plaintiff and Scanlan.

115.   The Female SU DPS Officer chose to begin her questioning of Plaintiff, who hours before was assaulted and thought she was going to be killed, by stating that Plaintiff was in violation of SU rules because she had a dog in her dormitory.   The reason why Plaintiff had a dog in her dormitory at the time was because Plaintiff had been housing and taking care of Scanlan's dog, Nav, in order to protect Nav from further abuse. Plaintiff had been planning on obtaining permission to keep Nav at her SU housing.

116.   After first reprimanding Plaintiff about Nav, the Female SU DPS Officer then told the Plaintiff, who hours before was assaulted and thought she was going to be killed, that she was being recorded and that she had better tell the truth.

117.   A DPS Officer asked Scanlan about the Cell Phone, and Scanlan denied damaging the Cell Phone.

118.   Because Plaintiff was in open view, and within ear shot, of Scanlan, Plaintiff initially denied that Scanlan damaged the Cell Phone when asked by the Female SU DPS Officer.

119.   The Female SU DPS Officer, in open view and within ear shot of Scanlan, then said to Plaintiff in sum and substance, "We talked to your roommate, and she said otherwise."

120.   This manner of questioning caused Plaintiff's roommate to fear for her safety due to possible retaliation by Scanlan.

121.   As a result of SU DPS' disclosure to Scanlan of Plaintiff's roommate involvement, Plaintiff's roommate sought and obtained a No Contact Order against Scanlan.

122.   Plaintiff told one of the male DPS officers that Plaintiff wanted to report everything that had happened but did not want to do it in front of Scanlan.

123.   The Female SU DPS Officer then took Plaintiff aside.   Plaintiff, believing it was safe to do so, told the Female DPS Officer that Scanlan had smashed the Cell Phone in the street.

124.  However, rather than protecting Plaintiff from retaliation by Scanlan, the Female SU DPS Officer then immediately went up to Scanlan and said that Plaintiff had reported that Scanlan had smashed the Cell Phone.

125.  Scanlan was then interviewed by members of SU DPS without Plaintiff present and, upon information and belief, admitted that he had gotten into an argument with Plaintiff.

126.  Scanlan admitted to DPS Officers that he had caused the hole in the wall during the incident.

127.  Upon information and belief, Scanlan further admitted to smashing the Cell Phone by throwing it on the ground.

128.  Upon information and belief, Scanlan admitted to SU DPS Detective Toia that Scanlan smashed the Cell Phone because he was jealous that Plaintiff had been talking to another male SU student.

129.  At least one SU DPS Officer had his body worn camera activated and recorded Scanlan's admissions.

130.  As Plaintiff reluctantly shared details of the altercation that corroborated Scanlan's admissions to SU DPS personnel, SU DPS Officers then proceeded to use those statements to confront Scanlan, and in doing so openly revealed to Scanlan that Plaintiff was cooperating with law enforcement.

131.  This manner of questioning caused Plaintiff to fear for her safety.

132.  This manner of questioning caused Plaintiff to realize that she would not be protected by SU DPS.

133.  At one point, Plaintiff stated to a male SU DPS officer in sum and substance, "If you're worried about my safety, you wouldn't be questioning me in front of him."

134.    Despite this request, Plaintiff was never interviewed in a separate location from Scanlan.

135.    Despite the above, one of the SU DPS officers, in open view and within ear shot of Scanlan, asked, in sum and substance, "Do you want him arrested? We can do that because he smashed your phone."

136.    In fear for her safety and knowing that Scanlan was watching, Plaintiff told SU DPS that she did not want Scanlan arrested.

137.    SU DPS made comments to Plaintiff indicating that SU DPS was aware that Scanlan was an important member of the SU Men's Lacrosse Team.

138.    SU DPS allowed Scanlan to leave the scene with no regard for Plaintiff's safety. SU DPS did not take measures to prevent Scanlan from later returning to Plaintiff's apartment aside from stating that mutual No Contact Orders would be issued, and that SU DPS would visit Plaintiff and Scanlan's respective apartments to have them sign the No Contact Orders.

139.    Upon information and belief, despite Scanlan admitting to traditional warning signs of domestic violence such as jealousy and damaging Plaintiff's cell phone, SU DPS did not photograph the hole in the apartment wall.

140.    During SU DPS's interview of Plaintiff, no SU DPS officer seemed aware of the January 22, 2021 No Contact Order that had been requested by Plaintiff against Scanlan, nor of the underlying facts that led to her being concerned for her safety, until Plaintiff herself disclosed that she had previously obtained a No Contact Order against Scanlan, i.e., the January 22, 2021 No Contact Order.

141.    The SU DPS officers then left.  Later that day, an officer from SU DPS arrived at Plaintiff's apartment and handed her a No Contact Order, which would prohibit Scanlan from

contacting Plaintiff.  This SU DPS officer also gave Plaintiff an informational flier about domestic violence, thereby acknowledging that the incident between Scanlan and Plaintiff was one of domestic violence.

142.    Because of the hostile, intimidating and problematic questioning on scene, Plaintiff did not report to SU DPS that Scanlan had assaulted her to the point that she feared for her life.

143.    SU DPS also never asked Plaintiff if she had been physically injured or worse. SU DPS asked if Plaintiff was harmed and then one of the SU DPS officers stated that he did not see any bruises, thereby, implying that she was unharmed.  In these circumstances, Plaintiff did not feel that she could report her assault.

144.    In the days following the Scanlan Assault, the injury to Plaintiff's ribs caused pain and discomfort to Plaintiff when she exercised, coughed, or yelled, such that Plaintiff took over the counter pain medication to treat the pain and would complain about the pain to Plaintiff's family members.

145.    The pain to Plaintiff's ribs was such that on April 29, 2021, Plaintiff sought medical attention and X-rays of her ribs, and was diagnosed with a bone contusion.

146.    As mentioned below, in the days that followed multiple employees of Defendant SU proceeded to apologize to Plaintiff and her Mother for how SU DPS handled the on-scene investigation of the Scanlan Assault.

147.    Despite apologies, Plaintiff had no faith in SU DPS and concluded that advising SU DPS about what actually transpired would only put her in more danger.

148.    As mentioned in further detail below, SU is currently a party to a Memorandum of Understanding with the Syracuse Police Department that specifies, amongst other things, cooperation with the Onondaga County District Attorney's Office ("Onondaga DA").[11]

149.    That Memorandum of Understanding states that although crimes on SU campus will "be handled initially and assessed by SU DPS campus peace officers," SU DPS is required to "make additional mandatory notifications to SPD's Abused Persons Unit (APU) and the [Onondaga County] DA's Office in cases of violations, misdemeanors, and felonies related to sexual abuse/deviance or domestic violence."[12]

150.    Upon information and belief, the Syracuse Police Department was not notified about the above incident nor the subsequent SU DPS investigation of the Scanlan Assault until over a week later, after the public became aware of the Scanlan Assault.

151.    Upon information and belief, the Onondaga DA was not notified about the above incident nor the subsequent SU DPS investigation of Scanlan Assault until over a week later, after the public became aware of the Scanlan Assault.

152.    For reasons not known at this time, the Syracuse Police Department and Onondaga District Attorney's Office did not seem to become involved with the Scanlan Assault investigation until over a week later.

**VII.    Defendant SU's Lack of Prosecution for Damage to University Property**

153.    Under the New York Penal Law, a person is guilty of criminal mischief in the fourth degree when, "having no right to do so nor any reasonable ground to believe that he or she has

---

[11] *See infra* note 58-59 and accompanying text.
[12] *See Syracuse Police Department and Syracuse University Department of Public Safety Memorandum of Understanding*, Syracuse University, Para. 13.g., *available at* https://dps.syr.edu/wp-content/uploads/2016/01/MOU-Signed-12-3-2014.pdf (last accessed Aug. 26, 2021) (emphasis added).

such a right, he or she intentionally damages property of another person"[13] or "recklessly damages property of another person in an amount exceeding two hundred fifty dollars"[14].

154.    For purposes of applying the New York Penal Law, a "person" is defined as "a human being, and where appropriate, a public or private corporation, an unincorporated association, a partnership, a government or a governmental instrumentality." As such, Defendant SU would be deemed a "person" under the New York State Penal Law.[15]

155.    Criminal mischief in the fourth degree is a class A misdemeanor punishable by up to a maximum of one year in jail or three years probation.

156.    Legal commentators have observed that there are advantages to using criminal mischief statutes in domestic violence situations when an aggressor damages communal property, specifically as contrasted against traditional physical assault charges.[16] One law enforcement domestic violence specialist stated that applying property crime laws to a batterer's destruction of community property was the "single biggest advance in domestic violence intervention".[17]

157.    For reasons not known at this time, SU DPS did not arrest Scanlan for the above-mentioned damage to Defendant SU's property nor did Defendant SU pursue criminal charges against Scanlan regarding Defendant SU's damaged property, i.e., the broken wall.

---

[13] NY Penal Law § 145.00(1)
[14] NY Penal Law § 145.00(3)
[15] NY Penal Law § 10.00(7)
[16] *See Memorandum of Law: Criminal Mischief - Charge in Domestic Violence*, Pace University Elisabeth Haub School of Law, *available at* https://law.pace.edu/criminal-mischief-charge-domestic-violence ("There are many advantages to using the criminal mischief statute in domestic violence situations…Application of the criminal mischief statute in domestic violence situations lessons problems that arise is charging a batterer with assault, (where injuries frequently are either not yet "repined" or misdemeanor level), because the police are there to witness the destroyed property….A tangential benefit to interpreting criminal mischief to apply to destruction of community property is that it will be one more tool that police officers can use to decide who is a primary aggressor during a domestic violence physical altercation…. The decision who to arrest (and in what context to avoid mutual arrest) is clearer when the criminal mischief misdemeanor and felony statutes are available charging options.")
[17] *Id.* ("The Domestic Violence Unit Chief of the San Diego Police Department, Lieut. Ray Sigwalt, has stated that the single biggest advance in domestic violence intervention occurred when California's vandalism laws were interpreted to apply to a batterer's destruction of community property.").

**VIII.   Defendant SU's Lack of Follow Up And Lack of Independent Investigation**

158.    After the SU DPS interview of Plaintiff, Plaintiffs Mother spoke on the phone with SU DPS Detective Toia at which time   SU DPS Detective Toia mentioned that he believed Scanlan had actually pushed or thrown Plaintiff into the wall causing the hole, and that Plaintiff was lying about what happened to protect Scanlan. SU DPS Detective Toia also apologized to Plaintiff's Mother for the way SU DPS handled the questioning of Plaintiff about the Scanlan Assault and mentioned that the incident was generating media attention because of Scanlan's status on the Men's Lacrosse Team

159.    On the evening of Sunday, April 18, 2021, Plaintiff's Mother arrived at SU to pick up Plaintiff and leave SU so that Plaintiff could stay with her family off-campus.

160.    Despite the suspicion SU DPS Detective Toia shared with Plaintiff's Mother, that Scanlan had pushed or thrown Plaintiff into a wall, there was no SU DPS present nor safety patrol of any kind at Plaintiff's SU apartment when Plaintiff's Mother arrived.

161.    Plaintiff's Mother also reported to SU DPS Detective Toia information about Scanlan's past misconduct, including but not limited to the prior history of violence against teammates, animal abuse, damaging and stealing Plaintiff's property, and Scanlan's pattern of domestic violence and stalking Plaintiff.

162.    On Monday, April 19, 2021, Plaintiff received an email from SU Title IX Coordinator Kelepurovski, the same SU employee to whom Plaintiff had made disclosures regarding domestic violence and stalking involving Scanlan in January 2021. The email detailed Plaintiff's options about how to proceed.

163.    The April 19, 2021 email made no mention or reference to Plaintiff's prior disclosures and the January 22, 2021, No Contact Order for which Plaintiff had filed for regarding

Scanlan.  The April 19, 2021 email was, in fact, identical to the email Plaintiff had previously received from the SU Title IX office in January 2021, indicating that it was a form email.

164.    On Thursday, April 22, 2021, Plaintiff met with SU Title IX Coordinator Kelepurovski and Emanuel Oliver, Plaintiff's assigned Case Manager from the Office of the Dean of Students, to discuss Plaintiff's options under SU's Title IX procedures.

165.    During the above meeting, SU Title IX Coordinator Kelepurovski appeared surprised when Plaintiff mentioned the hole in the wall that Scanlan had created during the incident. SU Title IX Coordinator Kelepurovski asked Plaintiff to provide a picture of the damage to the wall. Plaintiff provided said picture by email.

166.    During the above meeting, Plaintiff also informed SU Title IX Coordinator Kelepurovski about alleged claims that two women SU students had been sexually assaulted by Scanlan.

167.    During the above meeting, Plaintiff also informed SU Title IX Coordinator Kelepurovski about claims that Scanlan had struck a men's lacrosse teammate in the head with a lacrosse helmet and that she understood that the men's lacrosse coaches and the athletic leadership did nothing about to address Scanlan's violent actions towards another teammate.

168.    During the above meeting, Plaintiff also informed SU Title IX Coordinator Kelepurovski about an incident where, after Scanlan punched a freshman member of the SU Men's Lacrosse Team and gave him a black eye, the SU Men's Lacrosse Team Coaches suspended the individual Scanlan had assaulted, rather than Scanlan himself.

169.    SU Title IX Coordinator Kelepurovski apologized to Plaintiff for how SU DPS handled the initial interview on April 18, 2021, stating in sum and substance, "I'm so sorry, it was handled so poorly, it's not ok."

170.     During the meeting, SU Title IX Coordinator Kelepurovski explained the process for filing a formal Title IX complaint against Scanlan.

171.     During the meeting, Plaintiff reported that her ribs were painful as a result of the incident with Scanlan.  However, neither SU Title IX Coordinator Kelepurovski nor Mr. Oliver appeared concerned about this fact or recommended Plaintiff seek medical attention.

172.     During the meeting, Plaintiff was advised that if she were to file a complaint against Scanlan that she had to discuss her allegations against him in his presence (in person or via video).

173.     At the end of the meeting, it was agreed upon that Plaintiff would take time to decide if Plaintiff wanted to file a formal Title IX complaint against Scanlan.

174.     Plaintiff's Father subsequently contacted SU's Barnes Center At The Arch, the student wellness center, and mentioned the injury to Plaintiff's ribs.  It was only after this conversation that, on April 23, 2021, SU Title IX Coordinator Kelepurovski asked Plaintiff about her ribs.  Plaintiff responded that she was better.  However, as set out above, Plaintiff continued to experience pain in her ribs and on April 29, 2021 sought medical attention.

## IX.     Defendant SU's Decision to Reinstate Scanlan After A Few Days of Suspension

175.     In March 2021, Scanlan had violated the Syracuse Men's Lacrosse Team COVID-19 social distancing rules on two separate occasions, March 26 and 27, 2021. Members of the Syracuse Men's Lacrosse Team reported these incidents to the entire Men's Lacrosse Team coaching staff, including Defendant Desko, and voiced their concerns regarding Defendant Scanlon's inability to follow COVID-19 rules and risk other students' safety.

176.     As mentioned above, Defendant SU and Defendant Desko had prior direct knowledge, independent of Plaintiff, that Scanlan was capable of violence against other students.

For example, they were aware of the September 12, 2020 altercation in which Scanlan struck two of his teammates in the face.

177.     On Monday, April 19, 2021, following the domestic altercation involving Plaintiff, Scanlan was suspended from the Syracuse Men's Lacrosse Team indefinitely.

178.     Despite the above concerns and Scanlan's known record of breaking COVID-19 rules and assaulting his teammates, on Sunday, April 25, 2021, Syracuse University Senior Associate Director of Athletics Jamie Mullin informed the SU Men's Lacrosse Team captains and coaching Staff that Scanlan would be reinstated onto the team and allowed to rejoin team practice. That same day, the SU Men's Lacrosse Team held an anonymous vote to gather teammates opinions of kicking Scanlan off the team. The vote was 57-1.

179.     Plaintiff was never advised of Scanlan's reinstatement by any SU employees and learned about it on publicly available posts on Twitter.

180.     On Monday, April 26, 2021, local media began reporting that Scanlan's suspension was over and that Scanlan would be allowed to rejoin the team.

## X.     Plaintiff's Further Communications with SU's Title IX Office

181.     Reports and studies have explained for decades that institutions such as universities can cause additional psychological and physical harm when they fail to do what is reasonably expected of them by survivors of sexually motivated violence.[18] Plaintiff's psychological and physical harm was exacerbated by the crudely inappropriate and highly incompetent handling of the SU DPS questioning regarding the Scanlan Assault.

---

[18] *See When Sexual Assault Victims Speak Out, Their Institutions Often Betray Them*, The Conversation, https://theconversation.com/when-sexual-assault-victims-speak-out-their-institutions-often-betray-them-87050 (last accessed Aug. 11, 2021).

182.     Plaintiff's harms were further exacerbated by SU's failure to investigate or hold Scanlan accountable despite a documented history of domestic violence, stalking and sexual harassment provided to Defendant SU and instead reinstating him shortly thereafter while Plaintiff attempted to cooperate with the SU Title IX Office.

183.     On April 26, 2021, Plaintiff emailed SU Title IX Coordinator Kelepurovski to arrange a call to further discuss a Title IX formal complaint.   Although Plaintiff was interested in pursuing a Title IX formal complaint against Scanlan, she was concerned about Defendant SU's requirement that as part of the formal complaint procedure, she would have to attend the same video meeting as Scanlan.

184.     Also on April 26, 2021, Plaintiff sent a text message to DPS Detective Toia requesting to speak with him only to ensure that SU DPS had photographic documentation of the damage to the wall in Plaintiff's apartment.

185.     Plaintiff was contacted by Defendant SU and informed that repairs would be made to the damaged wall in Plaintiff's apartment.

186.     Given that SU Title IX Coordinator Kelepurovski and SU's Title IX Office did not appear to have knowledge about the damage to the wall prior to Plaintiff reporting it on the April 22, 2021, Zoom call, Plaintiff and her family were concerned that law enforcement had not yet photographed the damage.

187.     On the evening of April 26, 2021, Plaintiff's Father emailed Eric Nestor, Director of Apartment and Off-Campus Living, to request that the damage resulting from the domestic violence incident not be repaired until campus law enforcement had an opportunity to photograph the damage.

188.    On April 27, 2021, Plaintiff's Father emailed DPS Detective Toia to inform him that repairs were being scheduled and requested confirmation that the damage to the wall would be photographed prior to repairs. DPS Detective Toia confirmed that the damage had been photographed and saved.

189.    That same day, Plaintiff met via video with SU Title IX Coordinator Kelepurovski, Mr. Oliver, and Title IX Officer Sheila Johnson-Willis ("Title IX Officer Johnson-Willis") ("April 27, 2021, Title IX Meeting"). Title IX Officer Johnson-Willis explained the Title IX procedures, including the requirement that should Plaintiff file a formal complaint on her behalf, Plaintiff would need to appear for a virtual proceeding in front of SU Title IX staff and Scanlan, and be questioned by Scanlan's advisor.

190.    Title IX Officer Johnson-Willis further explained to Plaintiff that she would not be allowed to turn off her video camera during the video call, that she would not be allowed to turn off the screen showing Scanlan during the video call, and that she would only be allowed to use a post-it note to cover part of her screen but could not use a post-it note to cover Plaintiff's video camera.

191.    Title IX Officer Johnson-Willis also explained that Defendant SU could file a formal complaint on behalf of SU.

192.    During the April 27, 2021 Title IX Meeting, Plaintiff indicated that she was uncomfortable with the prospect of having to be on the same video call as Scanlan.

193.    During the April 27, 2021 Title IX Meeting, Title IX Officer Johnson-Willis also apologized for the manner in which SU DPS handled the Scanlan Assault on scene investigation.

194.    On April 28, 2021, Title IX Officer Johnson-Willis emailed Plaintiff to inquire whether Plaintiff will go forward with a formal Title IX complaint.

195.    Plaintiff replied to Title IX Officer Johnson-Willis stating, in sum and substance, that Plaintiff would not go forward with a formal Title IX complaint due to the requirement that she would have to confront Scanlan during the Title IX adjudication procedures. Plaintiff also stated that she would fully cooperate with SU's Title IX complaint against Scanlan and would confirm the information she previously reported to SU.

196.    Following the meeting, Plaintiff received a Notice of Investigation from the Office of Equal Opportunity, Inclusion and Resolution Services ("Notice of Investigation"), detailing Plaintiff's disclosures to Defendant SU. The report did not include the photograph of the damaged apartment wall outside of Plaintiff's bathroom where the incident occurred.

197.    On April 29, 2021, Plaintiff emailed the SU Title IX Office and Alyssa N. Campbell, Director of Equal Opportunity and Inclusion, regarding the omission of the photograph of the damaged wall.

198.    The Notice of Investigation stated that Defendant SU had received reports of possible violations of SU's Title IX Policy, and that Title IX Officer Johnson-Willis had initiated a Formal Complaint with SU's Title IX Office.

199.    The Notice of Investigation stated that Plaintiff had previously reported that during the period between the Spring 2020 semester and on or about the dates of the Scanlan Assault, Scanlan engaged in the following acts:

    i.   Pushing Complainant sometime during the summer of 2020 at an unidentified location.

    ii.  Refusing to return, then breaking, a bracelet belonging to Complainant, at an unidentified location during the specified timeframe.

   iii.  Removing, and refusing to return, Complainant's property, a mattress topper, from her unidentified residence without permission, during the specified timeframe.

   iv.  On multiple occasions during the specified timeframe, appearing at Complainant's unidentified residence uninvited and causing a disturbance by yelling, banging on the door, and demanding Complainant's location from Complainant's roommate.

v.   On multiple occasions during the specified timeframe, at Complainant's unidentified residence, standing outside Complainant's [ground floor] bedroom window looking in and banging on her window.

vi.   On at least one occasion, entering Complainant's unidentified residence uninvited while Complainant was sleeping, walking into her bedroom, turning the light on, and leaving.

vii.   On or about April 18, 2021, at Complainant's residence at 160 Small Road., Apt. #1, attempting to take Complainant's phone from her; when Complainant retreated to the bathroom, striking the bathroom door; causing the bathroom door to strike Complainant when she unlocked the door; pushing Complainant in the bathroom, taking her phone, and throwing the phone into the toilet, then taking Complainant's phone from her after she retrieved it from the toilet; blocking Complainant's roommate from checking on Complainant's condition; Respondent left Complainant's apartment with her phone, when Complainant followed Respondent outside, Respondent demanded to know who she had been speaking to then threw Complainant's phone to the ground, causing damage to the phone; Complainant picked up her phone and followed Respondent to his apartment at 101 Lambreth Ln., Apt. #8 where Respondent again took Complainant's phone from her and threw it to the floor causing further damage to the phone; when Complainant attempted to strike Respondent, he wrapped his arms around Complainant, squeezing her with sufficient force to cause her to experience pain in her ribs for several days afterward.

200.    The Notice of Investigation further stated that Defendant SU had conducted a preliminary inquiry and determined that the reported conduct fell under the scope of SU's Title IX Policy and that an investigation would proceed under SU's Title IX procedures.

201.    On April 29, 2021, Plaintiff's Mother emailed Title IX Coordinator Johnson-Willis to inform Defendant SU that the photograph of the damaged wall had not been included in the Notice of Investigation and requested confirmation that the photograph would be included.

## XI.    Plaintiff's Parents' Communications with Defendant SU & Defendant Wildhack

202.    On Monday, April 26, 2021, local media had begun reporting that Scanlan's suspension was over and that Scanlan would be allowed to rejoin the team.

203.    Around Monday, April 26, 2021, Plaintiff's Mother called Defendant Wildhack and left a voicemail.

204.    Around Monday, April 26, 2021, Coach Gait gave Plaintiff's Mother the phone number for the SU Office of University Counsel, specifically SU Deputy General Counsel Gabe Nugent.

205.    Around Tuesday, April 27, 2021, Plaintiff's Mother and Stepfather had a phone conversation with SU Deputy General Counsel Gabe Nugent ("Deputy General Counsel Nugent") to inquire what action the school was taking to hold Scanlan accountable and prevent additional harm to students.

206.    Deputy General Counsel Nugent explained that the SU Threat Assessment and Management Team ("TAMT") had made a determination that Scanlan's behavior did not warrant any official action or suspension. When asked, Nugent refused to provide information on who comprised the TAMT or how often it met.

207.    Deputy General Counsel Nugent further explained, in sum and substance, that TAMT's decision was based on several factors, including the fact that Plaintiff was no longer on campus since her parents took her home, so there was no longer a threat to Plaintiff's safety.

208.    During Deputy General Counsel Nugent's explanation, no mention was made of the fact that Plaintiff's roommate, who as a result of reporting details of the Scanlan Assault to Defendant SU, was so fearful of retaliation from Scanlan that she sought and obtained a No Contact Order against Scanlan.

209.    During Deputy General Counsel Nugent's explanation, no mention was made of the fact that although Plaintiff was not on campus, Plaintiff's roommate still was.

210.    When Plaintiff's Mother and Stepfather mentioned major details of Scanlan's behavior, such as the breaking of the Cell Phone, Deputy General Counsel Nugent stated that he "was not aware of" the details.

211.   Deputy General Counsel Nugent did not explain the rationale in allowing the alleged offender the benefit of staying on campus when the victim removed herself from the campus due to safety concerns.

212.   On April 29, 2021, Plaintiff's Mother emailed Defendant Wildhack to express her concern over the handling of recent events by SU, and in particular SU DPS, and requested a meeting to discuss the matter further.

213.   The email to Defendant Wildhack included the photograph of the damaged apartment wall. The email to Defendant Wildhack was also sent as a courtesy copy to the following members of the SU administration:

   a)  Gary Gait, Women's Lacrosse Head Coach;

   b)  Mary Kelly, Executive Assistant to Defendant Wildhack;

   c)  Title IX Coordinator Johnson-Willis;

   d)  Deputy Athletics Director Keenan-Kirkpatrick, who also serves as the liaison with the SU Title IX Office;

   e)  Kent Syverud, Chancellor and President of Syracuse University.

214.   In response to Plaintiff's Mother's email, a video call was held with Plaintiff's Mother and Stepfather, Defendant Wildhack, and Deputy General Counsel Nugent on April 30, 2021.

215.   During this video call, Director Wildhack stated that the decision to reinstate Scanlan was made by Defendant Desko. Deputy General Counsel Nugent attempted to cast the reinstatement in a positive light by stating that part of the benefit of reinstating Scanlan was that there would be more eyes on Scanlan and his whereabouts would be additionally monitored by his reporting to lacrosse practice.

216.     During this video call, Defendant Wildhack and Deputy General Counsel Nugent attempted to reassure Plaintiff's Mother and Stepfather of Plaintiff's safety, should she return to the SU campus, by describing the safety monitoring and escort services that Defendant SU could provide.

217.     During this video call, neither Defendant Wildhack nor Deputy General Counsel Nugent made any reference to Plaintiff's documented disclosures in January 2021 of sexual harassment, namely repeated crimes of domestic violence and stalking, inflicted by Scanlan.

218.     During this video call, neither Defendant Wildhack nor Deputy General Counsel Nugent made any reference to cooperation with law enforcement outside of SU.

219.     Instead, SU Deputy General Counsel Gabe Nugent, commented to Plaintiff's Mother and Stepfather, in sum and substance: "Just so you know, he's not getting arrested [in reference to reporting what had transpired to police]."

220.     After the failure of SU DPS to properly conduct an investigation of the Scanlan Assault on his daughter, and Defendant SU's disinterest in pursuing a credible investigation into their leading male lacrosse player, Plaintiff's Father contacted the New York State Police on or around April 27, 2021 to assist his daughter.

## XII.   Plaintiff Returns to SU Campus

221.     Since the 9th grade of high school, Plaintiff dreamed of playing Division I Lacrosse at Defendant SU.

222.     Despite the trauma she experienced and fear of retribution by Scanlan, Plaintiff sought to continue her educational and athletic opportunities at SU.

223.     Plaintiff notified Defendant SU, including SU DPS, of her return date to campus. When Plaintiff returned to SU Campus on May 2, 2021, no one from Defendant SU made any

form of outreach, safety checks, or in any way made safety related resources available to Plaintiff the day of her return or thereafter. This was despite the reassurances Defendant Wildhack and Deputy General Counsel Nugent made to Plaintiff's Mother and Stepfather during the video call on April 30, 2021.

## XIII. SU Men's Lacrosse Players Oppose Scanlan Rejoining the Team And Media Attention Grows

224.    As discussed above, Scanlan was suspended from the SU Men's Lacrosse Team on April 19, 2021, following the Scanlan Assault of Plaintiff.

225.    On Sunday, April 25, 2021, Syracuse University Senior Associate Director of Athletics Mullin informed the SU Men's Lacrosse Team Captains and Coaching Staff that Scanlan would be reinstated onto the team and allowed to rejoin team practice.  This was despite Scanlan's documented record of fighting teammates, disregarding COVID-19 safety rules and assaulting Plaintiff.

226.    On April 26, 2021, local media began reporting that Scanlan's suspension was over and that Scanlan would be allowed to rejoin the team.

227.    On April 26, 2021, members of the SU Men's Lacrosse Team met with Defendant Wildhack and Deputy General Counsel Nugent to express their opposition to allowing Scanlan to rejoin the team.

228.    On April 27, 2021, media reported that "some players had threatened to walk out or not attend practice" if Scanlan was allowed to return to the team.

> "A leadership group of the Syracuse lacrosse team told star attack Chase Scanlan that if he tries to practice with the team, players will walk out of practice, according to Scanlan's high school coach."[19]

---

[19] *See Coach John Desko to meet with media on Wednesday as Chase Scanlan situation intensifies*, WSYR-TV, https://www.localsyr.com/orange-nation/sources-players-threaten-walkout-over-scanlan-return/ (Last Accessed Aug. 5, 2021).

229.     On April 28, 2021, a press conference was held during which Defendant Desko minimized the situation, explaining that Scanlan had been suspended from the team "ten days ago" for "violating team rules and expectations".

230.     At the press conference, Defendant Desko stated that the decision to reinstate Scanlan was "his [Coach Desko's] decision".

231.     On April 27, 2021, it was reported that authorities were investigating Scanlan for a "domestic violence incident".[20]

232.     On April 30, 2021, local media reported that "Syracuse lacrosse captains did more to address Chase Scanlan situation than any authority figures" at Defendant SU.[21]

233.     On May 2, 2021, the Advance Media NY Editorial Board released an Opinion piece describing the situation as follows:

> "We're also proud of the work of our sports and news staffs to unravel the mystery behind the suspension of Syracuse University lacrosse star Chase Scanlan. *If the university had its way, the reason for team discipline against Scanlan would never have come to light.* Our reporting connected it to a domestic violence call to police. *The district attorney has opened an investigation into the incident and campus police's handling of it. We're also grateful to the five captains of the lacrosse team who kept the pressure on by refusing to practice with Scanlan.* As sports commentator Brent Axe remarked Friday, these young adults are schooling the athletic department, university administration and Coach John Desko about the seriousness of the allegation."[22]

## XIV.   Scanlan is Arrested As Men's Lacrosse Team Raises "One Love" Awareness

---

[20] *See DA: Authorities Investigating Scanlan For Domestic Violence Incident After UNC Game*, Spectrum News 1, https://spectrumlocalnews.com/nys/central-ny/su-sports/2021/04/27/chase-scanlan-practice-protest-syracuse-lacrosse (last accessed Aug. 11, 2021).

[21] *See Source Axe: Syracuse Lacrosse Captains Did More To Address Chase Scanlan Than Any Authority Figures*, Syracuse.com, https://www.syracuse.com/orangelacrosse/2021/04/axe-syracuse-lacrosse-captains-did-more-to-address-chase-scanlan-situation-than-any-authority-figures.html (last accessed Aug. 11, 2021).

[22] *See We're proud of local reporting that gets results (Editorial Board Opinion)*, Syracuse.com, https://www.syracuse.com/opinion/2021/05/were-proud-of-local-reporting-that-gets-results-editorial-board-opinion.html. (emphasis added) (last accessed Aug. 11, 2021).

234.    Upon Plaintiff's return to SU in an attempt to pursue her educational and athletic opportunities, Plaintiff remained traumatized from the Scanlan Assault.

235.    On May 3, 2021, Plaintiff was interviewed by Detective Michael Bates of the Syracuse Police Department without legal representation present.

236.    Following the interview, Plaintiff provided a sworn statement of the Scanlan Assault, and indicated her desire to press criminal charges against Scanlan.

237.    On May 4, 2021, Plaintiff secured a Family Court Order of Protection against Scanlan.

238.    Also on May 4, 2021, several members of the SU Men's Lacrosse Team posted public statements on social media to raise awareness around domestic violence and the One Love Foundation. The One Love Foundation was founded in the name of Yeardley Love, a University of Virginia (UVA) lacrosse player who was murdered by her ex-boyfriend, who also played lacrosse for UVA. Yeardley Love was murdered on May 3, 2010. In honor of the anniversary, members of the SU Men's Lacrosse Team posted statements that read:

> "I, an individual member of the Syracuse lacrosse team, stand firmly against domestic violence and domestic abuse of any form. When I play this sport, I now play to raise awareness and show support for all victims of domestic violence and abuse. Given the recent anniversary of Yeardley Love's death, and ILWomen's one love week, I pledge to continue to educate myself on learning the signs of unhealthy and increasingly dangerous relationships so that I can stand up, step in, and help to ensure dangerous situations do not become tragedies. I pledge to do this by using the resources made available to me by One Love…."[23]

---

[23] *See Syracuse lacrosse players send a message on domestic abuse: 'I now play to raise awareness'* , Syracuse.com, https://www.syracuse.com/orangelacrosse/2021/05/syracuse-lacrosse-players-send-a-message-on-domestic-abuse-i-now-play-to-raise-awareness.html (last accessed Aug. 5, 2021).

239.     On May 7, 2021, Scanlan was arrested on charges relating to the domestic altercation with Plaintiff, including misdemeanor criminal mischief in the fourth degree.[24]

240.     At no time following the Scanlan Assault, including upon Plaintiff's return to SU, did Plaintiff observe SU DPS perform a safety check on Plaintiff's status.

241.     On May 7, 2021, amidst the media coverage of Scanlan's arrest by the Syracuse Police Department, the only third-party support Plaintiff received was text messages from her teammates and Assistant Coach.

242.     Also on May 7, 2021, the Onondaga County Criminal Court issued an order of protection on behalf of Plaintiff against Scanlan.  Plaintiff's Mother called Deputy General Counsel Nugent to discuss Scanlan's arrest, which he previously advised her would never happen, and Defendant SU's response to the criminal court order of protection ordering Scanlan to stay away from Plaintiff. Deputy General Counsel Nugent was asked what measures Defendant SU would put in place to prevent Scanlan from violating that order of protection and if Defendant SU was absolved of responsibility regarding that order.

243.     Deputy General Counsel Nugent replied that he would get back to Plaintiff's family with that answer. Deputy General Counsel Nugent never contacted Plaintiff's family any further. Further, no one from Defendant SU contacted Plaintiff or her family about how they would monitor the criminal court order of protection on the SU campus.

244.     Upon information and belief, the SU Athletics Department did not request SU DPS to monitor Plaintiff's safety.  In fact, it was other SU students who expressed concerns for

---

[24] *See Syracuse lacrosse star Chase Scanlan arrested at Manley, jailed on domestic violence charge*, Syracuse.com, https://www.syracuse.com/orangelacrosse/2021/05/su-lacrosse-star-chase-scanlan-jailed-on-criminal-mischief-charge.html (last accessed Aug. 5, 2021).

Plaintiff's safety and were willing to take steps to protect her by offering to stay with Plaintiff in anticipation of Scanlan's release from jail.

245.     On May 9, 2021, the Advance Media NY Editorial Board released an Opinion piece describing the situation as follows:

> "Big-time sports are notorious for excusing domestic violence or sweeping it under the rug. That appears to be where the case of Chase Scanlan, the team's leading scorer, was headed before his teammates took a stand. Scanlan was involved in a "domestic incident" April 17 in a South Campus apartment that left a wall bashed in. Coach John Desko suspended Scanlan, and then quickly reinstated him. His teammates were not as willing as Desko or Athletic Director John Wildhack to turn the page. They refused to practice with Scanlan. He did not travel to Virginia or Notre Dame. The Onondaga County District Attorney and Syracuse police opened an investigation. On Friday, hours before the team's home game against Robert Morris, Scanlan was arrested on a misdemeanor criminal mischief charge in connection with destroying a woman's phone and a physical altercation with her. SU then suspended him from the team. What's happening off the field is more important that what happens on it. By word and deed, Syracuse players flipped the script on a sports culture that values winning above everything."[25]

246.     Only after the above arrest, on May 10, 2021, was Plaintiff's Mother contacted by Patricio Jimenez, EEO & Title IX Investigator, regarding an investigation into complaints of alleged violations of SU's Sexual Harassment, Abuse, and Assault Prevention Policy.

## XV.    Defendant Wildhack Celebrates Defendant Desko As He Announces His Retirement

247.     On Monday, June 7, 2021, Defendant SU announced Defendant Desko would retire after 23 years as head coach of the SU Men's Lacrosse Team.

248.     It was also announced that SU Women's Lacrosse Head Coach Gary Gait would replace Defendant Desko and serve as the SU Men's Lacrosse Head Coach.

249.     On Tuesday, June 8, 2021, the SU Athletics Department hosted a press conference for Defendant Desko, in which Defendant Wildhack praised Defendant Desko for, amongst other

---

[25] *See Ending domestic violence begins with men standing up against it (Editorial Board Opinion)*, Syracuse.com, https://www.syracuse.com/opinion/2021/05/ending-domestic-violence-begins-with-men-standing-up-against-it-editorial-board-opinion.html (last accessed Aug. 11, 2021).

things, contributing to the Syracuse Lacrosse Department's reputation for winning championships both as a student-athlete and Head Coach.

250.     During the press conference, Defendant Desko also highlighted his close relationship with Gary Gait, Roy Simmons II (Defendant Desko's predecessor Head Coach) and Roy Simmons III, SU's Director of Operations for the Men's Lacrosse Team.

251.     As noted above, on the morning of April 18, 2021, it was Roy Simmons III who called and spoke with Scanlan and Plaintiff the morning of April 18, 2021 before SU DPS was able to interview them.

252.     Defendant Desko's Retirement Press Conference is available online on the Syracuse Athletic Department's Official Youtube Channel.[26] This is in sharp contrast to the April 28, 2021 Press Conference in which Defendant Desko discussed Scanlan's reinstatement to the team and stated that it was Defendant Desko's decision to reinstate him. As one local media outlet observed:

> The school [Defendant SU] has seemingly tried to bury Desko's [April 28, 2021] press conference. It is not posted on the school's official website nor its official YouTube channel where the other Desko pressers are (Syracuse.com captured it). AD John Wildhack has not issued a statement, nor spoken to local media about it. His only comments come from the ACC Network, a cozy league-owned landing spot to tell a very simple version of the story. ("Cordial discussions," "distractions" etc.).[27]

## XVI.   Plaintiff Learns She is No Longer Welcome at SU

253.     Plaintiff was a highly lauded student athlete prior to attending SU. Plaintiff excelled at both academics and lacrosse.

---

[26] *See Head Coach John Desko's Retirement Press Conference*, Syracuse Orange, https://www.youtube.com/watch?v=y5cECoSaokc. (last accessed Aug. 5, 2021)

[27] *See Why is John Desko Risking the Chase Scanlan Situation Exploding In His Face?*, Orange Fizz, https://orangefizz.net/2021/04/why-is-john-desko-risking-the-chase-scanlan-situation-exploding-in-his-face/ (last accessed Aug. 5, 2021)

254.     Since the 9th grade, Plaintiff had dreamed of playing Division I lacrosse at Defendant SU.

255.     Plaintiff had been named as one of the top 100 regional girl lacrosse players and an all-county lacrosse player; had received all-county and all-state honors in another sport; had been awarded an outstanding senior athlete award; and was a member of the National Honor Society and the Foreign Language Society, amongst others.

256.     Plaintiff initially thrived as a student at Defendant SU and was recognized on the Dean's List in the Spring 2020 Semester for outstanding academic achievement.

257.     Plaintiff enrolled at Defendant SU to play Women's Lacrosse under an athletic and academic scholarship which included coverage of 40% tuition.

258.     After observing first-hand how Defendant SU, in particularly the SU Athletics Department, Title IX Office, and SU DPS prioritized Scanlan over Plaintiff, and due to the trauma Plaintiff experienced resulting from Defendants' negligence and facilitation of an unsafe and hostile environment, Plaintiff began considering entering the National Collegiate Athletic Association ("NCAA") Transfer Portal to explore the possibility of transferring and playing lacrosse at another institution.

259.     On June 15, 2021, Plaintiff had a conversation with SU Interim Women's Lacrosse Head Coach and learned that if Plaintiff entered the transfer portal, Plaintiff's 40% tuition scholarship was not guaranteed for the following year should Plaintiff decide to remain at SU and with the SU Women's Lacrosse Team.

260.     Also on June 15, 2021, Plaintiff received an email from Deputy Athletics Director Keenan-Kirkpatrick, informing Plaintiff that she wanted to have a conversation with Plaintiff regarding her Transfer Portal Application.

261.    Later that day, on June 15, 2021, Plaintiff had a phone conversation with Deputy Athletics Director Keenan-Kirkpatrick.

262.    Deputy Athletics Director Keenan-Kirkpatrick started the call by asking Plaintiff, in sum and substance, "Why do you want to transfer?" Deputy Athletics Director Keenan-Kirkpatrick mentioned that she was aware of the traumatic events involving Scanlan, and asked Plaintiff if that was the reason Plaintiff was transferring, or if instead the reason had to do with athletics or academics.

263.    Plaintiff responded that Plaintiff wanted to explore her transfer options because she was concerned about getting playing time on the lacrosse team.

264.    Plaintiff then told Deputy Athletics Director Keenan-Kirkpatrick that SU Interim Women's Lacrosse Head Coach had indicated Plaintiff's scholarship might be rescinded.

265.    Deputy Athletics Director Keenan-Kirkpatrick confirmed to Plaintiff that it was SU's and the SU Athletics Program's policy that scholarships can be rescinded when students enter the transfer portal.

266.    Deputy Athletics Director Keenan-Kirkpatrick also told Plaintiff that this policy to rescind scholarship money is usually applied where student athletes enter the transfer portal and leave SU in a "nasty way" or "burning bridges" with the school.

267.    Deputy Athletics Director Keenan-Kirkpatrick is a graduate of Seton Hall Law School has been licensed to practice law in New Jersey since 1993. Due to this background, she appeared sensitive to potential litigation by Plaintiff. For example, she had recommended to Coach Gates that SU Athletics personnel assess and document the injury to Plaintiff's ribs.

268.     Plaintiff understood Deputy Athletics Director Keenan-Kirkpatrick's mention of "burning bridges" and questions about Scanlan suggested that Plaintiff's scholarship would be jeopardized should she pursue legal action.

269.     On the return bus trip from Washington, D.C. to Syracuse, New York following the April 6, 2021 SU Women's Lacrosse Team match versus Georgetown University, Deputy Athletics Director Keenan-Kirkpatrick was personally advised by two of Plaintiff's Lacrosse teammates of their concerns regarding Plaintiff and Scanlan. The two teammates reported to Deputy Athletics Director Keenan-Kirkpatrick details regarding Scanlan entering Plaintiff's apartment without permission, checking her whereabouts, and being physically abusive towards Nav, his dog that Plaintiff adopted out of concern for the dog's welfare.

270.     When describing these disclosures that predated the April 18, 2021 Scanlan Assault during Defendant SU's Title IX investigation, Deputy Athletics Director Keenan-Kirkpatrick commented that "there's nothing you can do when the young lady won't be forthcoming".

271.     As of August 4, Deputy Athletics Director Keenan-Kirkpatrick is no longer employed by Defendant SU.[28]

272.     Amidst an external investigation into the accusations of years of bullying and harassment within the SU Women's Basketball Program by former SU Head Coach Quentin Hillsman, it was reported that Deputy Athletics Director Keenan-Kirkpatrick, along with other members of the SU athletic department, had fielded complaints about Coach Hillsman from student athletes for over 10 years.[29]  The Athletic further reported:

---

[28] *See 2 SU Athletic Administrators No Longer Employed As Hillsman Investigation Continues*, The Daily Orange http://dailyorange.com/2021/08/syracuse-athletic-administrators-no-longer-employed-amid-investigation/ (last accessed Aug. 6, 2021)

[29] *See Syracuse officials knew about Quentin Hillsman's misconduct, The Athletic reports*, The Daily Orange, http://dailyorange.com/2021/08/329671/ (last visited Aug. 6, 2021)

Outside of the coaching and support staff, few university employees have spent more time around the Syracuse women's basketball program over the last several years than Kim Keenan-Kirkpatrick. She was hired in August 2015 as a deputy athletic director and named the school's senior woman administrator.

She is also an athletic department liaison with the university's office of equal opportunity, inclusion and resolution services. That office provides sexual harassment training, fields complaints related to discrimination, harassment and sexual misconduct and ensures that the university complies with all state and federal laws pertaining to accommodations, access, sexual and relationship violence, discrimination and harassment, including Title IX.

With women's basketball – one of the five sports over which she is the "sport supervisor" – Keenan-Kirkpatrick was listed on travel logs for 35 of the Orange's 39 road trips over the past three seasons. (Over that same time frame, 18 players transferred from the program.) Former players and managers say it is unfathomable that Keenan-Kirkpatrick would not have been aware of at least some of the concerns about Hillsman's behavior.

"She was around way too much to not have known what the culture of that program was," says one former manager.

273.    On June 17, 2021, Plaintiff entered the NCAA Transfer Portal and began a dialogue with other schools about potentially transferring.

274.    On June 23, 2021, the SU Athletics Department announced that an alumnus and former SU Women's Lacrosse Team player, age 28, would become the new Head Coach ("New Coach").

275.    On July 11, 2021, Plaintiff had her first conversation with New Coach to discuss Plaintiff's future at SU.

276.    Plaintiff was with a friend when New Coach called and answered the call by utilizing the speaker phone option, an option Plaintiff uses for many calls.

277.    Plaintiff emphasized to New Coach that, although Plaintiff was exploring her options in the transfer portal, Plaintiff did not want to leave SU and wanted to make her mark on

the lacrosse team. Plaintiff explained that she had been prevented from doing so because of an injury and the situation with Scanlan.

278.     Plaintiff mentioned that she was considering transferring to Jacksonville University but was hesitant because Scanlan's cousin attended that school as well.

279.     New Coach encouraged Plaintiff to think about leaving SU, by telling Plaintiff that if Plaintiff would 100% go to Jacksonville but for Scanlan's cousin, then Plaintiff should not be at SU.

280.     When Plaintiff reiterated that she loves being at SU, New Coach replied that, in sum and substance, "You should talk to your parents and do what makes you happy". New Coach further implied that Plaintiff should not return to SU by asking if Plaintiff was happy when Plaintiff visited her family's home. Plaintiff understood New Coach to imply that if Plaintiff was happier at home than at SU, Plaintiff should not return.

281.     Plaintiff clarified to New Coach that Plaintiff went to her family's home because she did not feel safe at SU, to which New Coach responded, in sum and substance, "If you didn't feel safe, maybe you don't want to come back".

282.     Throughout the conversation, New Coach stressed that she could speak to other schools on behalf of Plaintiff. Plaintiff found this gesture disingenuous as they had never met and New Coach couldn't professionally vouch for Plaintiff.

283.     New Coach then asked Plaintiff, in sum and substance, if Plaintiff was moving forward with any legal proceedings. New Coach then abruptly ended the call.

284.     Plaintiff was surprised that New Coach asked about potential litigation.

285.     Plaintiff believed that New Coach was directed by Defendant SU to ask about Plaintiff about pending litigation.

286.     Plaintiff also had the impression that a third party from Defendant SU had been listening in on the call.

287.     Plaintiff was shaken by this call with New Coach.  She considered that New Coach, a coach she never met or had the opportunity to show her athletic ability too, had delivered the message to Plaintiff that Plaintiff is no longer welcome at SU's Women's Lacrosse or SU's Athletics generally and that if Plaintiff does not feel safe, she should not return.

288.     The questioning of Plaintiff about potential litigation against Defendant SU by New Coach was particularly inappropriate because, at least since May 16, 2021, Defendant SU had been aware that Plaintiff is represented by Counsel.  In particular, on May 16, 2021, Plaintiff's Counsel advised Defendant SU, including General Counsel Dan French and Deputy General Counsel Gabe Nugent (together, "SU Legal"), that they represent Plaintiff "as legal counsel on matters and circumstances related to Chase Scanlan and Syracuse University."  Thereafter, Plaintiff's Counsel emailed SU Legal a document preservation letter  advising them that litigation is being considered and thereby all relevant material should be preserved at Defendant SU "including the years 2015 to present including Syracuse Athletics' recruitment of Mr. Scanlan from 2015 to present; Mr. John Desko's athletic recruitment of male lacrosse players for Syracuse University; Mr. John Wildhack's recruitment of male athletes for Syracuse University" … thereby requiring that Defendant Wildhack and Defenant Desko be put on notice about potential litigation on matters and circumstances related to Chase Scanlan and the University.

289.     On July 30, 2021, in response to New Coach's questioning, Plaintiff's Counsel emailed SU Legal:

> [We are] writing to state the obvious – ***that professional staff members of SU's Athletics and specifically SU Women's Lacrosse program abstain from speaking to [Plaintiff] in relation to potential litigation against SU.***

290.     SU Legal responded that they were unaware of this line of questioning by New Coach.

291.     Plaintiff is left to believe the intimidating litigation inquiry and messaging that Plaintiff is no longer welcome at SU Athletics by New Coach and intimidating statement regarding "burning bridges" or leaving in a "nasty way" from Deputy Athletics Director Keenan-Kirkpatrick came directly from the leadership of Defendant Wildhack.

292.     Defendant Wildhack's leadership of the SU Athletics Department has recently been publicly scrutinized as allegations of "a toxic culture in the [Defendant SU] women's basketball program from nine former players and 19 other sources associated with the program" have become public. [30]

293.     At a June 15, 2021 press conference, Defendant Wildhack publicly declared his "total support" of Coach Hillsman and support of the "the values he [Hillsman] has for this program".[31] Only a few days later, the investigating article published by The Athletic cited conversations with multiple players, team managers, and staff members, who detailed allegations of unwanted physical contact, threats, and bullying by SU Women's Basketball Head Coach Quentin Hillsman.[32] As one article put it:

> If Wildhack knew the seriousness of the allegations at the podium that June day and gambled that Syracuse could ride them out, that's a problem….
>
> If Wildhack wasn't aware of the seriousness of the allegations at the time, that's a bigger problem….
>
> The alleged issues of verbal abuse and bullying by Hillsman stretch back over the past few years to the point where several players reported having suicidal

---

[30] *See Axe: Coach Q's resignation exposed a crack in John Wildhack's leadership of SU Athletics*, Syracuse.com, https://www.syracuse.com/orangewomen/2021/08/axe-coach-qs-resignation-exposed-a-crack-in-john-wildhacks-leadership-of-su-athletics.html (last accessed Aug. 6, 2021).
[31] *See Id.*
[32] *See Syracuse coach Quentin Hillsman accused of inappropriate behavior, bullying in Athletic report*, Syracuse.com, https://www.syracuse.com/orangewomen/2021/06/syracuse-coach-quentin-hillsman-accused-of-inappropriate-behavior-bullying-in-athletic-report.html (last accessed Aug. 5, 2021).

thoughts as a result of their experience under Hillsman. It's reasonable that Wildhack can't know and see everything that occurs under his watch, but you're telling me none of that filtered its way up to the [Athletic Director]'s office?...

How did Wildhack sign off on allowing Hillsman to hire Ronnie Enoch, an assistant coach with sexual harassment allegations in his recent past? Enoch is no longer employed by Syracuse....

Hillsman's resignation comes off the heels of the Chase Scanlan situation at Syracuse this past spring. While one can't draw a straight line from that to Hillsman, there is a distinct similarity in the two scenarios that raise an eyebrow at Wildhack's leadership.

Scanlan had a pattern of misbehavior that should have removed him from campus long before the tragic domestic violence incident that will forever be associated with his name and the 2021 Syracuse lacrosse season. Former Syracuse men's lacrosse head coach John Desko has to live with the biggest dent in his reputation as a result of that and is now retired.

But what about Wildhack? Where was his leadership to step in and remove a problem before it became a tragedy and federal law precluded him from action?[33]

294.    After the distressing July 11, 2021, call with New Coach, Plaintiff began to seriously consider transferring to Jacksonville University, whereby entering into the NCAA Transfer Portal resulted in Plaintiff being offered a 50% student athlete scholarship by Jacksonville University.

295.    Four days later, on July 15, 2021, Plaintiff was advised by Jacksonville University that because one of Scanlan's cousins would be a female freshman lacrosse player there, it would not be in Plaintiff's best interest if Plaintiff attended Jacksonville University.

296.    Plaintiff has been deprived of educational opportunities and benefits not just at Defendant SU, but also at other colleges or universities as a result of, *inter alia*, the following: (i) Defendant SU's deliberately indifferent handling of Plaintiff's January 2021 reports of sexual

---

[33] *Axe: Coach Q's resignation exposed a crack in John Wildhack's leadership of SU Athletics*, Syracuse.com, https://www.syracuse.com/orangewomen/2021/08/axe-coach-qs-resignation-exposed-a-crack-in-john-wildhacks-leadership-of-su-athletics.html (last accessed Aug. 6, 2021).

harassment; (ii) Defendant SU's deliberately indifferent investigation of the Scanlan Assault; (iii) Plaintiff's inappropriate treatment by SU DPS; (iv) Defendant SU's indifference to Plaintiff's safety once Plaintiff returned to Defendant SU's campus; (v) Deputy Athletics Director Keenan-Kirkpatrick's comments to Plaintiff that her athletic scholarship could be at risk if she left Defendant SU in a "nasty way" or by "burning bridges:" and; (vi) New Coach's statements implying that Plaintiff is not welcome at SU's Athletics.

## XVII. Defendant SU's Title IX Policy Is Meant to Prevent & Redress Sexual Harassment

297.     Defendant SU maintains and publishes the SU Handbook, [34] which states all students must comply with SU's Sexual Harassment, Abuse, and Assault Prevention Policy, ("SU's Title IX Policy").[35]

298.     The SU Title IX Policy outlines SU's policies, procedures, and rules relating to sexual harassment and assault of students.

299.     The goal of the SU Title IX Policy is to prevent and redress "Prohibited Conduct" by "setting community expectations regarding discrimination and harassment; describing what conduct is prohibited; and explaining how the University will respond to reports of prohibited conduct".[36]

300.     The SU Title IX Policy defines "Prohibited Conduct" to include: "1) Sexual Harassment as defined in Title IX regulations, 2) Sexual Assault, 3) Dating and Domestic Violence, 4) Stalking, 5) Retaliation, and 6) Sexual Exploitation."[37]

---

[34] *See Syracuse University 2020-2021 Student Handbook*, Syracuse University, https://ese.syr.edu/wp-content/uploads/sites/20/2020/12/Syracuse-University-Student-Handbook-2020-2021.pdf (last accessed Aug. 6, 2021).
[35] *See Sexual Harassment, Abuse, and Assault Prevention Policy*, Syracuse University, https://policies.syr.edu/policies/university-governance-ethics-integrity-and-legal-compliance/sexual-harassment-abuse-and-assault-prevention/ (last accessed Aug. 6, 2021).
[36] *See id.,* Section II.
[37] *See id.,* Section III.B.

301.     Title IX Regulation 34 C.F.R. § 106.30 defines "sexual harassment" to include domestic violence[38] and stalking[39]. Thus, Defendant SU's Title IX policy is meant to prevent and redress, among other conduct, the use of physical force against an intimate partner's person or property, and courses of conduct that would cause a reasonable person to fear for his or her safety or suffer substantial emotional distress.

## XVIII. Defendant SU's Failures in Responding to Plaintiff's Ongoing Sexual Harassment

302.     The SU Handbook includes a "Student Bill of Rights for cases involving Sexual or Relationship Violence or Harassment" which states that under New York's Enough is Enough sexual misconduct prevention law, all student complainants and respondents in cases involving sexual harassment or assault have the right to, in pertinent part:

a) Make a report to local law enforcement and/or state police;
b) Have disclosures of Dating or Domestic Violence, Stalking, Sexual Assault, and other forms of Sexual Harassment treated seriously;
c) Make a decision about whether or not to disclose a crime or violation and participate in the judicial or conduct process and/or criminal justice process free from pressure by the institution;
d) Be treated with dignity and to receive from the institution courteous, fair, and respectful health care and counseling services, where available;
e) Be free from any suggestion that the reporting individual is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations;
f) Describe the incident to as few institution representatives as practicable and not be required to unnecessarily repeat a description of the incident;

---

[38] The term "domestic violence" includes "felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the victim, under the domestic or family violence laws of the jurisdiction receiving grant monies, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction." 34 U.S.C. § 12291(a)(8). A "crime of violence" is "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another" 18 USCS § 16.
[39] The term "stalking" means engaging in a course of conduct directed at a specific person that would cause a reasonable person to (A) fear for his or her safety or the safety of others; or (B) suffer substantial emotional distress. 34 U.S.C. § 12291(a)(30).

303.     The SU Title IX Policy identifies SU's Title IX Coordinator, Sheila Johnson-Willis, who is "responsible for educating the University community about Title IX, applicable policies, procedures, resources, and reporting options; developing educational programming and initiatives; overseeing the University's response to reports of Prohibited Conduct and related conduct, including coordinating Supportive Measures; overseeing prompt and equitable investigations and resolutions of reports of Prohibited Conduct; and facilitating individual and community remedies."[40]

304.     The SU Title IX Policy details resources and reporting options for students that include "seeking counseling or assistance from a Confidential Resource, making a report under this policy, and/or making a report to external law enforcement."[41] The SU Title IX Policy states that reports of Prohibited Conduct should be made to either the Title IX Coordinator, the Office of Human Resources, or the SU DPS.[42]

305.     The SU DPS webpage professes that the SU DPS is a "professional campus law enforcement agency" that is responsible for "keeping the peace, protecting life, reducing crime and enforcing laws, all aimed at protecting the lives of our students, faculty and staff".[43]

306.     The 2015 ATIXA white paper, *The Challenge of Title IX Responses to Campus Relationship and Intimate Partner Violence*, advised Title IX Administrators that:

> IPV [Intimate Partner Violence] is often both cyclical in nature and prone to spiraling. The vast majority of perpetrators of IPV engage in the behaviors over and over again and the severity of their actions tends to increase over time. Additionally, unlike most victims of sexual violence, IPV victims are often placed in harm's way if they report the matter to law enforcement or campus authorities; indeed, upon learning of the report or of the fact that

---

[40] *See Sexual Harassment, Abuse, and Assault Prevention Policy*, Syracuse University, Section III, F. https://policies.syr.edu/policies/university-governance-ethics-integrity-and-legal-compliance/sexual-harassment-abuse-and-assault-prevention/ (last accessed Aug. 6, 2021).
[41] *See id.*, Section III. G.
[42] *See id.*
[43] *See* SU DPS Mission and Vision Statement, *available at* https://dps.syr.edu/about/mission-and-vision-statement/?redirect (last visit Aug. 6, 2021).

police or authorities are involved, abusers may blame and try to punish their victims through additional violence.[44]

307.    The same ATIXA white paper articulates a widely understood feature of domestic violence, that "[t]hose trying to assist victims of intimate partner violence may encounter *reluctance on the victim's part* to seek help, make changes, make an on-campus Title IX report, or file off-campus criminal charges".[45] Specifically discussing recantation, ATIXA advises campus administrators that:

> Once victims are brave enough to come forward, some quickly regret doing so. They *often experience mixed feelings about reporting the abuse of an intimate partner*. They can experience betrayal by family or friends who don't support them. More worrying, they can be *pressured to recant by their abusers once the abusers find out that their partners have told authorities about the abuse.*[46]

308.    In 2015, the National Domestic Violence Hotline released the results of a survey, *Who Will Help Me? Domestic Violence Survivors Speak Out About Law Enforcement Responses* that explicitly advised law enforcement about barriers in reporting, including:

a)  Survivors frequently cite fear of reprisal by the abuser as a reason for not calling law enforcement.

b)  Many survivors report that law enforcement fails to investigate domestic violence cases appropriately.[47]

309.    In 2016, in response to a request from the White House Task Force to Protect Students from Sexual Assault, the University of Texas at Austin's Institute on Domestic Violence

---

[44] *See The Challenge of Title IX Responses to Campus Relationship and Intimate Partner Violence: The 2015 Whitepaper*, Association of Title IX Administrators, https://cdn.atixa.org/website-media/o_atixa/wp-content/uploads/2012/01/18122546/Challenge-of-TIX-with-Author-Photos.pdf at 7.
[45] *See id.* at 6.
[46] *See id.* at 12.
[47] *See Who Will Help Me? Domestic Violence Survivors Speak Out About Law Enforcement Responses*, National Domestic Violence Hotline, https://www.thehotline.org/wp-content/uploads/media/2020/09/NDVH-2015-Law-Enforcement-Survey-Report-2.pdf.

& Sexual Assault released *The Blueprint for Campus Police: Responding to Sexual Assault*, with the stated goal of replacing tradition with science by serving as a guide for police at all levels (including investigation and patrol) in response to sexual assault crimes with the implementation of victim-centered and trauma-informed approaches.[48] This Blueprint specifically advises patrol officers to, amongst other things:

    a) Understand the neurobiology of trauma, common emotional responses to trauma, and hold off on making credibility judgments;[49]

    b) Not to pressure the survivor into making decisions about participating in the investigation or prosecution during initial interviews;[50]

    c) Understand that survivors may fear retaliation by the suspect and be uncooperative in order to protect themselves, but also might change their mind at a later date;[51]

    d) Offer to call a victim advocate to support the victim during the first report;[52]

    e) In cases between former intimate partners, ask the victim if they experienced other crimes, such as stalking or domestic violence, during or before the current commission of the crime.[53]

310.    The National Domestic Violence Hotline identified reproductive coercion as "a form of power and control where one partner strips another of the ability to control their own reproductive system".[54] A 2019 study by the University of Pittsburgh and Michigan State

---

[48] *See The Blueprint for Campus Police: Responding to Sexual Assault*, University of Texas at Austin Institute on Domestic Violence & Sexual Assault, School of Social Work, https://utexas.app.box.com/v/blueprintforcampuspolice.

[49] *See id.* at 86.

[50] *See id.* at 92.

[51] See *id.* at 99.

[52] See *id.* at 101.

[53] See *id.* at 107.

[54] *See Types of Abuse*, The National Domestic Violence Hotline, https://www.thehotline.org/resources/types-of-abuse/ (last accessed Aug. 5, 2021).

University found that nearly one in eight sexually active females between the ages of 14 and 19 had experienced reproductive coercion in the last three months alone.[55]

311.    As Plaintiff reported numerous times to employees of Defendant SU, Scanlan was attempting to control her reproductive health. Reproductive coercion has been found to be associated with post-traumatic stress disorder.[56]

312.    A presentation titled *Title IX Training: An Integrated and Coordinate Approach*, created by Cozen O'Connor for Defendant SU, is available on Defendant SU's website and specifically discusses the dynamics of sexual and gender-based harassment and violence.[57] Specifically relating to disclosure, the presentation explains that a survivor's disclosure process is not a one-time event but rather an on-going process that can include denials, recantations, and reaffirmations.

313.    Given the above, Defendant SU, including SU DPS and SU's Title IX Office, should have reasonably foreseen the risk of harm in the form of domestic and/or gender-based harassment and violence to its female students, including Plaintiff.  In fact, the risk of domestic and/or gender-based harassment and violence to SU students is acknowledged in SU's own policies and procedures.

---

[55] *See* Hill, Amber L. MSPH; Jones, Kelley A. PhD; McCauley, Heather L. ScD; Tancredi, Daniel J. PhD; Silverman, Jay G. PhD; Miller, Elizabeth MD, PhD, *Reproductive Coercion and Relationship Abuse Among Adolescents and Young Women Seeking Care at School Health Centers*, Obstetrics & Gynecology: Aug. 2019, Vol. 134, Issue 2 (2019) *available at* https://journals.lww.com/greenjournal/Fulltext/2019/08000/Reproductive_Coercion_and_Relationship_Abuse_Among.20.aspx; *see also What You Should Know about Reproductive Coercion*, Teen Vogue, https://www.teenvogue.com/story/what-is-reproductive-coercion (last accessed Aug. 5, 2021)

[56] See McCauley, H.L., Falb, K.L., Streich-Tilles, T., Kpebo, D., & Gupta, J, *Mental health impacts of reproductive coercion among women in Côte d'Ivoire*, International Journal of Gynaecology and Obstetrics: the official organ of the International Federation of Gynaecology and Obstetrics vol. 127,1 (2014): 55-9, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5783185/

[57] *See* https://inclusion.syr.edu/wp-content/uploads/2020/09/2020-08-28-Syracuse-Title-IX-training-Cozen-OConnor.pdf, at 81.

314.     Despite the above, SU DPS and SU's Title IX Office failed to adequately respond to the domestic violence and stalking that Plaintiff suffered. Regarding the January 2021 disclosures, Defendant SU irresponsibly rescinded the January 22, 2021 No Contact Order without properly investigating the risk of future negative incidents between Plaintiff and Scanlan. Defendant SU further failed to properly maintain records and share information between the SU Title IX Office, Athletics Department, and SU DPS regarding Scanlan's pattern of documented treatment of Plaintiff. The end result was that on April 18, 2021, the responding SU DPS Officers were left to rely on Plaintiff to recount the January 22, 2021 No Contact Order and details of prior sexual harassment she had _already_ disclosed to Defendant SU in January 2021.

315.     Further, despite the widely understood issues regarding sexual harassment and domestic violence described above, SU DPS engaged in such callous, hostile, and confrontational questioning with such little regard for Plaintiff's safety and well-being after refusing to arrest Scanlan that Defendant SU's own employees apologized on three separate occasions:

a) SU DPS Detective Toia apologized to Plaintiff's Mother shortly following the Scanlan Assault, 2021, *see supra* ¶158;

b) SU Title IX Coordinator Kelepurovski apologized to Plaintiff on April 22, 2021, *see supra* ¶169;

c) SU Title IX Officer Johnson-Willis apologized to Plaintiff on April 27, 2021, *see supra* ¶193;

316.     Further evidencing Defendant SU's deliberately indifferent investigation and coordination between SU DPS and Defendant SU's Title IX Office is the fact that on April 22, 2021, SU Title IX Coordinator Kelepurovski appeared to be surprised when Plaintiff mentioned

the hole in the apartment wall caused by Scanlan and that there was no mention of the property damage in the initial Title IX Notice of Investigation Plaintiff received on April 29, 2021.

317.     The SU Title IX Policy details resources and reporting options for students that include "seeking counseling or assistance from a Confidential Resource, making a report under this policy, and/or making a report to external law enforcement." The SU Title IX Policy states that reports of Prohibited Conduct should be made to either the Title IX Coordinator, the Office of Human Resources, or SU DPS.

318.     Specifically, regarding law enforcement cooperation, SU Title IX Policy states that Defendant SU "will report allegations of criminal conduct and potential criminal conduct to the appropriate local law enforcement, consistent with the terms in the University's Memorandum of Understanding with the Syracuse Police Department. The University's report to local law enforcement, however, *does not obligate the Complainant to pursue criminal charges*." (Emphasis added).

319.     Accordingly, SU students should have been able to rely on Defendant SU to ensure appropriate coordination between the SU Title IX Office, SU DPS and the Syracuse Police Department when necessary, in order to properly address potential threats to students – regardless of whether the Complainant wished to pursue criminal charges.

320.     Defendant SU's Memorandum of Understanding with the Syracuse Police Department states that although crimes on SU campus will "be handled initially and assessed by DPS campus peace officers", SU DPS is required to "make additional *mandatory* notifications to

SPD's Abused Persons Unit (APU) *and* the [Onondaga] DA's Office in cases of violations, misdemeanors, and felonies related to sexual abuse/deviance or domestic violence".[58]

321.   Additionally, SU DPS personnel's law enforcement authority includes:

Responding to the violation of, and enforcing any provision of, any law related to domestic/relationship violence, to include the making of arrests for ~~violation of~~ [sic] a criminal offense or violation of an order of protection, transporting victims to an appropriate shelter, and/or advising victims of their rights and remedies by issuing the proper SPD and/or NYS form -- *All such activities, enforcement actions, and investigations shall be coordinated with SPD 's Abused Persons Unit (APU). Also, see Items #13.g. and #14.j., which require DPS to make additional mandatory notifications to SPD 's CID Desk and the DA 's Office*.[59]

322.   When investigating incidents, SU DPS must follow the specifications listed in Paragraph 14.j. which states that:

In addition to notifying SPD's CID Desk and per earlier agreements established in the year 2002, DPS will continue to <u>also</u> notify both SPD's APU and the DA's Office of sex offenses and domestic/relationship violence, regardless of the severity or nature of the offense. (Emphasis in original)

323.   Accordingly, SU students, including Plaintiff, should have been able to rely on Defendant SU to ensure that SU DPS personnel would be trained on how to 1) identify potential sex offenses and domestic/relationship violence, "regardless of the severity or nature of the offense"; and 2) ensure that the mandatory notifications are made to the SPD's Abused Persons Unit and the Onondaga District Attorney's Office. As detailed herein, neither entity became involved with the Scanlan Assault investigation until over a week later.

324.   Accordingly, members of SU DPS should have been trained on how to recognize the warning signs associated with Scanlan's behavior and should have known the risk to Plaintiff.

---

[58] *See* Syracuse Police Department and Syracuse University Department of Public Safety Memorandum of Understanding, Para. 13.g. available at https://dps.syr.edu/wp-content/uploads/2016/01/MOU-Signed-12-3-2014.pdf (last accessed June 7, 2021) (emphasis added).
[59] *Id.* at Para. 14.h.(emphases in original).

As detailed herein, SU DPS did not respond appropriately to the Scanlan Assault including by questioning Plaintiff in front of Scanlan and failing to take steps to ensure Plaintiff's safety.

325.    By maintaining a campus in New York State, Defendant SU and its respective policies and procedures are also subject to Article 129-B of the New York Education Law, "Implementation By Colleges and Universities of Sexual Assault, Dating Violence, Domestic Violence and Stalking Prevention and Response Policies and Procedures".

326.    Pursuant to Article 129-B, N.Y. Educ. Law § 6443 provides all students the right to, in pertinent part:

1. Make a report to local law enforcement and/or state police;
2. Have disclosures of domestic violence, dating violence, stalking, and sexual assault treated seriously;
3. Make a decision about whether or not to disclose a crime or violation and participate in the judicial or conduct process and/or criminal justice process free from pressure by the institution;
4. Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard;
5. Be treated with dignity and to receive from the institution courteous, fair, and respectful health care and counseling services, where available;
6. Be free from any suggestion that the reporting individual is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations;
7. Describe the incident to as few institution representatives as practicable and not be required to unnecessarily repeat a description of the incident;
8. Be protected from retaliation by the institution, any student, the accused and/or the respondent, and/or their friends, family and acquaintances within the jurisdiction of the institution;
9. Access to at least one level of appeal of a determination;
10. Be accompanied by an advisor of choice who may assist and advise a reporting individual, accused, or respondent throughout the judicial or conduct process including during all meetings and hearings related to such process;
11. Exercise civil rights and practice of religion without interference by the investigative, criminal justice, or judicial or conduct process of the institution

327.    N.Y. Educ. Law § 6444(4)(h) provides that institutions "shall ensure that individuals are provided the following protections and accommodations", including Educ. Law § 6444(4)(h)'s right to interim measures:

> To obtain reasonable and available interim measures and accommodations that effect a change in academic, housing, employment, transportation or other applicable arrangements in order to help ensure safety, prevent retaliation and avoid an ongoing hostile environment, consistent with the institution's policies and procedures.

328.    As discussed above, the interim measures provided by Defendant SU were completely lacking and as discussed below, Plaintiff was instead subject to retaliation.

## XIX.    Defendant SU's Deliberate Indifference, Retaliation and Intimidation

329.    Reports and studies have explained for decades that institutions such as universities and the military can cause additional psychological and physical harm when they fail to do what is reasonably expected of them by sexual assault survivors.[60]

330.    A 2013 study by the Journal of Traumatic Stress titled *Dangerous Safe Havens: Institutional Betrayal Exacerbates Sexual Trauma*, reported that women in universities who faced institutional betrayal reported increased levels of anxiety, trauma-specific sexual symptoms, dissociation, and problematic sexual functioning.[61]

331.    Forms of institutional betrayal examined in the study include not taking proactive steps to prevent sexual harassment, creating an environment in which sexual harassment seems common or like no big deal, making it difficult to report the experiences, covering up experiences, and punishment in some way for the experience. [62]

332.    Plaintiff was made to suffer through an environment where her sexual harassment was deprioritized and minimized. While Plaintiff observed Defendant SU reinstate Scanlan in the

---

[60] *See When Sexual Assault Victims Speak Out, Their Institutions Often Betray Them*, The Conversation, https://theconversation.com/when-sexual-assault-victims-speak-out-their-institutions-often-betray-them-87050 (last accessed Aug. 10, 2021).
[61] *See* Smith, C. P., & Freyd, J. J., *Dangerous Safe Havens: Institutional Betrayal Exacerbates Sexual Trauma*. Journal of Traumatic Stress, 26(1), 119-124 (2013) *available at* https://dynamic.uoregon.edu/jjf/articles/sf2013.pdf
[62] *See* Institutional Betrayal Questionnaire (IBQ) and Various Derivative Versions of the IBQ *available at* https://dynamic.uoregon.edu/jjf/institutionalbetrayal/ibq.html.

interest of the SU Men's Athletics Department, Plaintiff was left to deal with a Title IX proceeding that put the onus on her and was incomplete and uninformed (e.g., the lack of mention of property damage).

333.    Despite the numerous apologies made by employees of Defendant SU regarding the questioning by SU DPS regarding the Scanlan Assault, Plaintiff did not observe any corrective action taken against SU DPS personnel. At the same time, despite Defendant SU having a documented history of crimes of domestic violence since January 2021, Plaintiff was neither encouraged nor directed to contact the Syracuse Police Department.

334.    Once Scanlan was finally arrested and Plaintiff attempted to get some closure and move past the ordeal, she instead faced a lack of support and even outright retaliation and intimidation. Plaintiff was effectively punished for the assault perpetrated against her by Scanlan by the very same institution to whom she had decided to trust with her college athletic career. Negative and punitive actions taken by Defendant SU against Plaintiff include the following:

a)  Plaintiff had failed a class in the Fall 2020 semester after completing her Spring 2020 semester on the Dean's List. Plaintiff explained to her professor that she had been attempting to leave an abusive relationship for the majority of the semester. Following the Scanlan Assault, Plaintiff received no support from Defendant SU in addressing the F on her transcript and was asked to email the professor again herself.

b)  As Plaintiff began exploring the possibility of transferring out of Defendant SU, Defendant SU personnel caused her further trauma by stating she was in danger of losing her athletic scholarship if she "burned bridges" or left Defendant SU in a "nasty way".

c)  Despite this half-veiled retaliatory threat, Plaintiff remained open to finishing her career with the SU Women's Lacrosse Team. But upon mentioning her desire to stay, Plaintiff was encouraged to leave Syracuse, to think about where she would feel safer, and openly asked if she was proceeding with legal action in the very same discussion with New Coach.

## XX.  Defendant SU's History of Inadequately Addressing Sexual Harassment and Title IX Issues

335.  In the past, Defendant SU has been criticized by its own student body on how it handles domestic and sexual violence.

336.  In May 2014, Chancellor Kent Syverud announced the closure of SU's Advocacy Center, formerly known as the R.A.P.E. Center, without any campus input or discussion.

337.  In November 2014, a collective of SU student organizations called "THE General Body" claimed letters of support from alumni and faculty and occupied a SU administration building to protest the closure of the SU Advocacy Center and complained about SU's lack of a Yes Means Yes consent policy. THE General Body also submitted to SU administration specific criticisms of the prior SU Title IX coordinator in matters where Defendant SU was seen as not taking seriously the complaints of female students.

338.  In December 2014, Defendant SU received the Final Report from the Chancellor's Workgroup on Sexual Violence Prevention, Education and Advocacy, which identified "numerous service gaps" and a "serious lack of communication at all levels in the Syracuse University community".[63] Specifically, the report stated there was:

> "Insufficient staff and resources to effectively investigate incidents of sexual assault and relationship violence, and to educate members of the

---

[63] *See December 17, 2014, Final Report,* Syracuse University Chancellor's Workgroup on Sexual Violence Prevention, Education, and Advocacy, at 4, *available at* https://inclusion.syr.edu/wp-content/uploads/2016/12/workgroup-final-report-2014-dec.pdf

Syracuse University community. This has led to a lack of information and training for faculty, staff, and students regarding legal and other obligations to report incidents. Current training appears to consist of little more than information sharing and the obligations of 'responsible employees' to report incidents of sexual assault and relationship violence to the Title IX coordinator."[64]

339.    The report specifically highlighted Defendant SU's Athletics Department, noting that:

"More resources and attention need to be allocated to particular constituencies on campus, especially Greek organizations, athletic teams and staff, and other student groups traditionally associated with a disproportionate amount of sexual and relationship violence".[65]

340.    Defendant SU was one of the universities mentioned in a September 2015 CNBC report titled "One of the most dangerous places for women in America".[66]

341.    The CNBC report detailed a sexual assault incident against a SU student that occurred in 2012 that never led to criminal charges.

342.    Defendant SU responded to the criticism by putting out a press release in April 2016 regarding SU's renewed efforts in sexual assault and relationship violence, and the hiring of a new equal opportunity and Title IX investigator, Bernie Jacobson, to support the investigation process.[67]

343.    On June 22, 2016 and January 17, 2017, the US Department of Education's Office of Civil Rights (OCR) announced investigations into complaints that Defendant SU had failed to respond promptly and equitably to a report of sexual assault. The OCR's investigation did not

---

[64] *See id.*, at 5.
[65] *See id.*
[66] *See One of the most dangerous places for women in America*, CNBC.com, https://www.cnbc.com/2015/09/22/college-rape-crisis-in-america-under-fire.html (last accessed Aug. 6, 2021).
[67] *See It's On Us: Addressing Sexual Assault and Relationship Violence*, Syracuse University News: Campus & Community, https://news.syr.edu/blog/2016/04/25/its-on-us-addressing-sexual-assault-and-relationship-violence-44234/ (last visit Aug. 6, 2021).

result in a finding that Defendant SU had violated the law related to Title IX compliance and enforcement.

344.      In October 2016, SU students dragged mattresses marked with tape that read "rapists go here", "survivor", and "I can hear your silence" onto the campus Quad area to "protest what they say is a rape culture on campus" and to call attention to OCR investigations into SU's handling of a sexual assault.[68]

## XXI.   Notice of Long-Standing Issues Within Defendant SU's Athletics Department

345.      Tragedies involving student-athlete misconduct, in particular violence against women students, have been part of a hostile sexual environment and culture within Defendant SU's Athletic Department for decades.

346.      In 1982, two members of the SU Men's Basketball Team were charged with first degree of sexual assault and unlawful restraint after allegedly raping a Villanova University student. The charges were dismissed in July 1983, following a hearing where the survivor explained that she did not wish to relive the experience by testifying.[69]

347.      In 1986, Syracuse University football player Tom Watson was charged with felony first-degree rape for the sexual assault of an SU freshman student in her dormitory room.[70] Tom Watson eventually pled guilty to sexual misconduct and was sentenced to three years probation.[71]

348.      Despite the criminal charges, Defendant SU's initial review of the football player's conduct led to school officials recommending on August 6, 1986, that no disciplinary action be taken against the player. This recommendation "was widely criticized by local media and women's

---

[68] *See SU students protest handling of sexual assault cases with mattresses, red tape*, Syracuse.com, https://www.syracuse.com/su-news/2016/10/su_students_protest_handling_o.html (last visited Aug. 6, 2021).
[69] *See Charges of Rape are Dismissed*, The New York Times, (July 8, 1983), https://www.nytimes.com/1983/07/08/sports/charges-of-rape-are-dismissed.html (last visited Aug. 10, 2021).
[70] *See Thomas Watson, A Syracuse University Football player…*, Los Angeles Times, (July 26, 1986), https://www.latimes.com/archives/la-xpm-1986-07-26-sp-140-story.html (last accessed Aug. 10, 2021).
[71] *Id.*

groups that charged the university put sports ahead of consideration for victims of sexual crimes".[72] Later that same month, Defendant SU overruled their August 6, 1986 determination to suspend Watson for five games and place him on probation for the year.[73]

349.     In April 1988, Syracuse University football "star" Tommy Kane was arrested after allegedly assaulting a female police officer.[74] Years later, Mr. Kane was arrested for the stabbing murder of the mother of his children, plead guilty to manslaughter charges, was sentenced to 18 years in prison.[75]

350.     In 1990, Syracuse University third year student and Men's Basketball player was investigated for sexual misconduct allegations and admitted to an "inappropriate" relationship involving a 14-year old girl.[76]

351.     In 1991, Syracuse police requested a criminal summons against SU Basketball player Adrian Autry for allegedly punching an ex-girlfriend.[77]

352.     In 1996, SU Basketball player Todd Burgen was suspended for 7 games for "using physical harm and threat of physical harm" against a female SU student.[78]

---

[72] *See Syracuse University football player Tom Watson, who pleaded guilty...*, United Press International Archives, (Aug. 28, 1986), https://www.upi.com/Archives/1986/08/28/Syracuse-University-football-player-Tom-Watson-who-pleaded-guilty/8198525585600/ (last accessed Aug. 10, 2021).

[73] *See id.*

[74] *See Football star arrested for assaulting officer*, United Press International Archives, (Apr. 13, 1988), https://www.upi.com/Archives/1988/04/13/Football-star-arrested-for-assaulting-officer/8509576907200/ (last accessed Aug. 10, 2021).

[75] *See SU'S Kane Sentenced To 18 Years In Prison*, The Buffalo News, (Nov. 6, 2004), https://buffalonews.com/news/sus-kane-sentenced-to-18-years-in-prison/article_92a3da18-5132-5cbd-9a4e-488f9f7a604d.html

[76] *See Syracuse Puts Johnson on Probation*, Los Angeles Times (Feb. 6, 1991), https://www.latimes.com/archives/la-xpm-1991-02-06-sp-907-story.html (last accessed Aug. 10, 2021)(noting that Defendant SU's discipline for the player was one year probation, community service, counseling, and a written apology to the girl).

[77] *See* Jamison Foser, *How Syracuse Basketball Coach Jim Boeheim's Public Statements Contribute to a Poisonous Atmosphere* (Nov. 29, 2011, 6:12 PM), https://www.jamisonfoser.com/blog/2011/11/how-syracuse-basketball-coach-jim-boeheims-public-statements-contribute-to-a-poisonous-atmosphere.html (last accessed Aug. 10, 2021) (citing the Syracuse Post-Standard's reporting January 9, 1993) .

[78] *See Burgan Appeals Suspension*, The Daily Gazette, (Nov. 28, 1996), https://news.google.com/newspapers?nid=1957&dat=19961128&id=H4hGAAAAIBAJ&sjid=NekMAAAAIBAJ&pg=3761,6774310&hl=en (last accessed Aug. 10, 2021)

353.      In 2002, Billy Edelin was recruited to the SU Basketball team. Before he could

play his first game, two female SU students accused him of rape and sexual harassment.[79] Criminal

charges were not filed, and Edelin was allowed to play after being suspended for several months.

354.      Also in 2002, then-leading scorer for the SU Men's Basketball team DeShaun

Williams was   arrested for allegedly punching a women SU student in the face.[80]

355.      In December 2008, SU Men's basketball player Eric Devondorf was suspended

after a SU student disciplinary hearing concluded that he struck a female SU student in the jaw.[81]

This attack occurred while Devondorf was already serving probation imposed by Defendant SU

for harming a student earlier that year.

356.      In September 2017, then-freshman SU Men's Basketball player Dominick Parker was

arrested and charged with sexual abuse in the first degree regarding an 18-year-old female

allegedly was incapable of giving consent.[82]

357.      In February 2020, two actions were filed under the New York Child Victims Act

("CVA") against former Olympic athlete Conrad Mainwaring regarding allegations that he was

sexually abusing young boys in his SU dormitory while employed as a residential advisor and

assistant coach with Defendant SU.

358.      The suits allege that Defendant SU did not properly vet Mainwaring to ensure he

was qualified to work in the capacity for which he was hired and knowingly and willingly failed

---

[79] See From Prodigy to Pariah, Washington Post, (Feb. 3, 2003),
https://www.washingtonpost.com/archive/sports/2003/02/03/from-prodigy-to-pariah/241c3606-93e0-4d03-81b2-ef8c1656516a/ (last accessed Aug. 10, 2021).
[80] *See Player allegedly hit woman who played Otto*, Associated Press,
http://www.espn.com/ncb/news/2002/0509/1380448.html (last accessed Aug. 10, 2021).
[81] *See Devendorf suspended from Syracuse University; board says he didn't take past probation seriously*,
Syracuse.com, https://www.syracuse.com/news/2008/12/syracuse_university_basketball.html (last accessed Aug. 10, 2021).
[82] *See Syracuse men's basketball walk-on Dominick Parker charged with sexual abuse*, The Daily Orange,
http://dailyorange.com/2017/09/syracuse-mens-basketball-walk-on-dominick-parker-charged-with-sexual-abuse/ (last accessed Aug. 10, 2021).

to conduct proper investigations into credible claims that Mainwaring was using his full and unsupervised access to SU facilities to meet with and abuse male high school and college students in the 1980's.[83]

359.     In 2021, a lawsuit was filed under the CVA against former SU Basketball coach Bernie Fine in connection with allegations that he sexually assaulted a minor for over two years in the early 1970's. The sexual assault allegedly occurred when Fine was employed as Lincoln Junior High School in Syracuse and served as a foster parent for the county.[84]

360.     Defendant SU hired Fine in 1976. Fine was serving as associate head coach for SU's Men's Basketball Team in 2011 when he was terminated after allegations surfaced that he sexually assaulted two former ball boys and another youth.[85]

361.     Since 2018, Defendant SU's Women's Basketball Program has seen 20 players transfer to other schools with 11 players transferring out of Defendant SU in the latest off-season.

362.     An article published by The Athletic cited conversations with 20 sources, including players, team managers, and staff members, who detailed allegations of unwanted physical contact, threats, and bullying by SU Women's Basketball Head Coach Quentin Hillsman.[86]

363.     The Athletic further reported that Coach Hillsman was engaging in gender-based harassment by kissing players on their foreheads and that two of the players tried alerting school officials about the problems in the Women's Basketball program. Despite this, at an end-of-year

---

[83] *See Judges keeps Syracuse University in lawsuit over accused ex-Olympian molester; city schools tossed*, Syracuse.com, https://www.syracuse.com/crime/2021/05/judges-keeps-syracuse-university-in-law-suit-over-accused-ex-olympian-molester-city-schools-tossed.html (last accessed Aug. 6, 2021).
[84] *See Former SU basketball coach Bernie Fine sued for alleged sexual assault,* The Daily Orange, http://dailyorange.com/2021/01/former-su-basketball-coach-bernie-fine-sued-alleged-sexual-assault/ (last accessed Aug. 5, 2021).
[85] *See id.*
[86] *See Syracuse coach Quentin Hillsman accused of inappropriate behavior, bullying in Athletic report*, Syracuse.com, https://www.syracuse.com/orangewomen/2021/06/syracuse-coach-quentin-hillsman-accused-of-inappropriate-behavior-bullying-in-athletic-report.html (last accessed Aug. 5, 2021).

news conference earlier in June 2021, Defendant Wildhack framed the high number of transfers as an innocuous "sign of the times".

364.    The SB Nation reported that Coach Hillsman was allegedly allowed to create a staff position for his friend, Ronnie Enoch. [87]

365.    Prior to being hired by the SU Athletic Department, Enoch served as the associate head coach of the North Carolina Central University women's basketball team. Enoch was dismissed from that job for gender-based harassment, including discussing boyfriends and birth control with the players.[88]

## XXII.  Defendant SU's Systemic Title IX Compliance Issues and Prevalence of On-Campus Sexual Violence Persists

366.    Under New York State's Enough is Enough legislation, SU is required to conduct a Survey on Sexual and Relationship Violence. The most recent data released in December 2020 showed that 19% of the students who participated in the survey had experienced nonconsensual sexual contact at SU, and that just 5% of students who were sexually assaulted while at SU reported their assault to the university. Further, the 5% non-reporting statistic had not changed since SU's previous report in 2018.[89]

<u>**LEGAL CLAIMS**</u>

**COUNT I**
**SEX DISCRIMINATION IN VIOLATION OF TITLE IX - 20 U.S.C. 1681(a)**
**AGAINST DEFENDANT SU**
**(Deliberate Indifference to Plaintiff's January 2021 Reports of Sexual Harassment)**

---

[87] *See Report alleges Syracuse women's basketball culture of abuse, fear under Quentin Hillsman*, SB Nation, https://www.nunesmagician.com/2021/6/29/22555590/report-alleges-syracuse-womens-basketball-culture-of-abuse-fear-under-quentin-hillsman (last accessed Aug. 5, 2021).
[88] *See 'Creepy' behavior: NCCU women's coach ousted after parent complaint*, WRAL.com, https://www.wral.com/nccu-associate-women-s-basketball-coach-ousted/14617132/ (last accessed Aug. 5, 2021).
[89] *See At SU, 95% of students sexually assaulted don't report their abuse*, The Daily Orange, http://dailyorange.com/2021/03/syracuse-university-students-sexual-assault-report-abuse/ (last accessed Aug. 6, 2021).

367.     Plaintiff incorporates paragraphs 1 to 366 into this Count by reference as though fully restated herein.

368.     Upon information and belief, at all relevant times, Defendant SU received federal financial assistance.

369.     Plaintiff sustained harassment because of her sex that was so severe, pervasive and/or objectively offensive that it deprived her of access to educational opportunities.

370.     Because both Plaintiff and Scanlan were enrolled students of Defendant SU and lived in student dormitories maintained by SU, the sexual harassment Plaintiff endured was subject to Defendant SU's control and Defendant SU could have taken remedial action.

371.     Beginning on January 4, 2021, Defendant SU had actual knowledge of the severe, pervasive, and objectively offensive sexual harassment experienced by Plaintiff in the form of domestic violence as defined in 34 U.S.C. 12291(a)(8) and stalking as defined in 34 U.S.C. 12291(a)(30) inflicted upon her by Scanlan.

372.     Beginning on January 4, 2021, Defendant SU had actual knowledge of the risk that Plaintiff would face additional instances of the above sexual harassment while there was a possibility of encountering Scanlan on campus.

373.     SU employees with authority to address the alleged sexual harassment and institute corrective measures had actual knowledge of the sexual harassment sustained by Plaintiff and failed to adequately respond, despite Defendant SU having independently been put on notice since September 12, 2020, of Scanlan's prior violent behavior against his own teammates.

374.     Defendant SU's response to the sexual harassment Plaintiff endured and Defendant SU's lack of response was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances, which included being on notice since

September 12, 2020, of Scanlan's prior violent behavior against his own teammates and being informed in January 2021 of Scanlan's violent behavior towards animals.

375.     Defendant SU acted with deliberate indifference to Plaintiff's January 2021 reports to multiple SU employees of repeated domestic violence and stalking to multiple SU employees by failing to independently investigate Scanlan as a possible threat to Plaintiff or other students' safety.

376.   Defendant SU was further deliberately indifferent by:

a)  failing to take any disciplinary measures in response to Plaintiff's report aside from issuing a mutual No Contact Order;

b)  removing the January 22, 2021 No Contact Order after an on-line procedure and confirmatory telephone call that only asked Plaintiff if she felt safe, without further inquiry into why she wanted the No Contact Order removed or taking further steps to prevent future negative interactions between the students, despite Section 4.10 of the SU Student Handbook explaining that "No Contact Orders will not be considered for removal or amendment if all elements of the written appeal are not addressed or if there is evidence of the potential for future negative incidents between listed parties"; and

c)  failing to independently investigate the prior allegations of domestic violence, stalking, animal abuse, property damage, and property theft against Scanlan despite at least one SU Employee within the SU Athletics Department commenting that Scanlan was dangerous and should not be on campus.

377.     In effect, Defendant SU's response to Plaintiff's report of domestic violence and stalking was to callously assume Plaintiff, at age 19, could navigate the dynamics of an abusive dating relationship by herself.

378.     The sexual harassment Plaintiff suffered was so severe, pervasive, and objectively offensive that it effectively deprived Plaintiff of access to educational opportunities and benefits, including negatively impacting her grades and failing one of her classes in the Fall 2020 Semester after making Deans List the semester prior, and causing severe psychological distress.

379.     As a direct and proximate result of Defendant SU's deliberate indifference to Plaintiff's sexual harassment, Plaintiff was made vulnerable to additional sexual harassment and did undergo additional sexual harassment, including domestic violence as defined under 34 U.S.C. 12291(a)(8), that transpired during the Scanlan Assault.

380.     Had Defendant SU not been deliberately indifferent to Plaintiff's sexual harassment, which included several instances of domestic violence and stalking, and instead complied with its own policies and federal law by promptly investigating 1) Plaintiff's disclosures in January 2021 in an independent, trauma-informed manner, and 2) Plaintiff's decision to withdraw the January 22, 2021, No Contact Order, Scanlan would have been removed as a threat to Plaintiff before events of the Scanlan Assault. Instead, SU's failures exposed Plaintiff to harassment, sexual and mental abuse, the destruction of her cell phone, a life-threatening physical assault.

### COUNT II
### SEX DISCRIMINATION IN VIOLATION OF TITLE IX – 20 U.S.C. 1681(a)
### AGAINST DEFENDANT SU
### (Deliberate Indifference to Scanlan Assault and Incident of Sexual Harassment)

381.     Plaintiff incorporates paragraphs 1 to 366 into this Count by reference as though fully restated herein.

382.     Plaintiff sustained harassment because of her sex that was so severe, pervasive and/or objectively offensive that it deprived her of access to educational programs and

opportunities, including the health, educational, and athletic career benefits that Plaintiff would have enjoyed as a Division I athlete at Defendant SU, but for the sexual harassment.

383.     Because both Plaintiff and Scanlan were enrolled students of Defendant SU and lived in student dormitories maintained by Defendant SU, the sexual harassment Plaintiff endured was subject to Defendant SU's control and Defendant SU could have taken remedial action.

384.     Title IX requires universities to promptly investigate student complaints of sexual harassment, and to take interim measures to ensure that its students are not subjected to a hostile education environment. The failure to do so amounts to "deliberate indifference" for which universities may be held liable under Title IX.

385.     Defendant SU was on notice and aware of the sexual harassment experienced by Plaintiff as well as the identity of assailant Scanlan as early as January 2021.

386.     Defendant SU was on notice and aware that Plaintiff continued to experience sexual harassment, specifically domestic violence and stalking, as well as the identity of assailant Scanlan, as recently as April 18, 2021.

387.     Defendant SU employees with authority to address the alleged sexual harassment and institute corrective measures had actual knowledge of the sexual harassment sustained by Plaintiff and failed to adequately respond.

388.     Defendant SU's response to the harassment Plaintiff endured from the Scanlan Assault and Defendant SU's lack of response was deliberately indifferent, insofar as the response was clearly unreasonable in light of the known circumstances, which included being on notice of Scanlan's prior violent behavior against students since September 12, 2020 and being on notice of Scanlan's prior sexual harassment of Plaintiff and animal abuse since January 2021.

389.    Defendant SU acted with deliberate indifference to Plaintiff's report of domestic violence and the Scanlan Assault and by failing to properly investigate the circumstances and potential threat to Plaintiff both on that date and in the weeks that followed.

390.    Defendant SU was deliberately indifferent by:

a) failing to properly interview Plaintiff regarding the Scanlan Assault and instead questioning her in a hostile and intimidating manner in open view of Scanlan, rather than considering her request to be interviewed separately from him;

b) forcing Plaintiff to decide whether she wanted Scanlan arrested while subject to the above questioning, less than 24 hours after the traumatic sexual harassment, and without providing Plaintiff counseling or further information;

c) failing to ascertain on April 18, 2021, that Plaintiff had suffered physical pain and a bone contusion to her ribs;

d) failing to ascertain on April 18, 2021, that Plaintiff had been assaulted;

e) failing to ascertain on April 18, 2021, that Plaintiff had previously requested a No Contact Order against Scanlan in January 2021 and had previously disclosed a pattern of domestic violence and stalking;

f) failing to provide same-day safety measures and accommodations besides providing Plaintiff with a mutual No Contact Order and an informational flier about domestic violence;

g) failing to properly consider the Scanlan Assault incidents of sexual harassment and assault in light of the documented prior incidents of domestic violence, stalking, animal abuse, property damage, and property theft against Scanlan despite at least

one SU Employee commenting that Scanlan was dangerous and should not be on campus;

h)   failing to properly coordinate with the Syracuse Police Department's Abused Persons Unit in responding to the Scanlan Assault incident of sexual harassment, assault and domestic violence as per the terms of the Memorandum of Understanding Between the Syracuse Police Department and Defendant SU's Department of Public Safety;

i)   failing to timely notify the Onondaga County District Attorney's Office in responding to the Scanlan Assault's incidence of sexual harassment and domestic violence as per the terms of the Memorandum of Understanding between the Syracuse Police Department and Defendant SU's Department of Public Safety; and

j)   allowing the SU Department of Public Safety, SU Athletics Department, and other SU officials – all of whom had authority to take corrective action under Title IX – to under-report the events of the Scanlan Assault by *inter-alia*: failing to document the fact that Scanlan created a hole in an apartment wall owned by Defendant SU and re-instating Scanlan onto the SU Men's Lacrosse Team after less than one week.

391.    In effect, Defendant SU's response to the most recent episode of domestic violence suffered by Plaintiff was to place the burden of holding Scanlan accountable through the filing of a formal Title IX complaint on Plaintiff, despite Defendant SU having been on notice since January 2021 of Scanlan's history of domestic violence, stalking, and animal abuse and having further been on notice since September 2020 of Scanlan's prior violent behavior against his own teammates.

392.    Defendant SU's actions, and/or lack thereof, constitute "deliberate indifference" in violation of Title IX.

393.      As a direct and proximate result of Defendant SU's deliberate indifference to Plaintiff's sexual harassment and Defendant SU's violations of Title IX, Plaintiff was subjected to a hostile education environment while attempting to pursue her education.

394.      As a direct and proximate result of Defendant SU's deliberate indifference to Plaintiff's sexual harassment and the Defendants SU's violations of Title IX, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

395.      As a direct and proximate result of Defendant SU's deliberate indifference to Plaintiff's asexual harassment and Defendant SU's violations of Title IX, Plaintiff suffered damages and injuries for which Defendant SU is liable.

**COUNT III**
**SEX DISCRIMINATION IN VIOLATION OF TITLE IX - 20 U.S.C. 1681(a)**
**AGAINST DEFENDANT SU**
**(Hostile Environment)**

396.      Plaintiff incorporates paragraphs 1 to 366 into this Count by reference as though fully restated herein.

397.      As set forth in detail above, Defendant SU actively created and/or condoned and/or was deliberately indifferent to a culture of sexual harassment and domestic violence against women by instituting policies and permitting practices that included, but were not limited to:

a)    purposefully ignoring and/or condoning a social culture of impunity for sexual harassment perpetrated by Scanlan;

b)    intentionally ignoring and/or delaying investigations of complaints of domestic violence perpetrated by Scanlan;

c)    failing to objectively and sufficiently investigate complaints of sexual misconduct and/or assault, and in particular Plaintiff's complaints regarding Scanlan;

d)    failing to timely hold evidentiary and/or disciplinary hearings to the detriment of Plaintiff, a female complainant;

e)    by providing Scanlan a male accused of sexual misconduct and/or sexual assault unwarranted leniency in the adjudication of Title IX concerns brought by Plaintiff, a female student; and

f)    failing to accommodate Plaintiff's interests in remaining with the SU Women's Lacrosse Team and instead encouraging Plaintiff to leave SU.

398.    Defendant SU's sexually hostile policies and practices were a proximate cause of Plaintiff's subjection to sexual harassment in the form of

399.    domestic violence and assault from the Scanlan Assault;

400.    a hostile educational environment; and

401.    ongoing and prolonged harassment by forcing Plaintiff to interact with Scanlan before the Scanlan Assault on campus and athletic facilities and forcing Plaintiff to witness Defendant initially receive a favorable, short suspension from the SU Men's Lacrosse Team.

402.    The sexual harassment that Plaintiff suffered was so severe, pervasive, and objectively offensive that it deprived her of access to educational programs and opportunities, including the health, educational, and athletic career benefits that Plaintiff would have enjoyed as a Division I athlete at Defendant SU, but for the sexual harassment.

403.    As a direct and proximate result of the Defendant SU's creation of and deliberate indifference to its sexually hostile educational environment, Plaintiff suffered damages and injuries for which Defendant SU is liable.

**COUNT IV**
**RETALIATION IN VIOLATION OF TITLE IX - 20 U.S.C. 1681(a)**
**AGAINST DEFENDANT SU**

404.     Plaintiff incorporates paragraphs 1 to 366 into this Count by reference as though fully restated herein.

405.     Plaintiff engaged in Title IX protected activities when she reported that she was assaulted to Defendant SU.

406.     Defendant SU had knowledge that Plaintiff engaged in protected activity.

407.     Plaintiff's engagement in protected activity was closely followed by adverse action, treatment, and conditions by Defendant SU.

408.   The adverse actions, treatment, and conditions included:

a)  Deputy Athletics Director Keenan-Kirkpatrick's comments to Plaintiff that her athletic scholarship could be at risk if she left Defendant SU in a "nasty way" or by "burning bridges;"

b)  New Coach's remarks discouraging Plaintiff from remaining at Defendant SU, by implying that Plaintiff would feel safer at home and should not remain at Defendant SU if she did not feel safe; and

c)  New Coach directly and inappropriately asking Plaintiff if she was moving forward with legal proceedings.

409.     There was a causal connection between Plaintiff's protected activity and Defendant SU's adverse action, treatment, and conditions against Plaintiff.

410.     A retaliatory motive played a part in the adverse actions toward Plaintiff.

411.      As a result of Defendant SU's adverse actions, Plaintiff has suffered damages.

**COUNT V**
**NEGLIGENCE**
**AGAINST DEFENDANT SU, DEFENDANT DESKO, AND DEFENDANT WILDHACK**

412.     Plaintiff incorporates paragraphs 1 to 366 into this Count by reference as though fully restated herein.

413.     Defendants SU, Desko, and Wildhack breached their duty of care owed to Plaintiff.

414.     The duty of care owed to Plaintiff is outlined in Article 129-B of NY CLS Educ Law.

415.     Defendants SU, Desko, and Wildhack had a duty to hire competent personnel, adequately train the personnel annually, adequately supervise this personnel, and terminate or sanction personnel for inadequate performance.

416.     Defendants owed a duty of care to Plaintiff to ensure that their staff and personnel were properly trained and supervised.

417.     Defendants breached these duties of care and were negligent in their screening, hiring, training, supervision, disciplining and retaining as follows:

a) Failing to thoroughly investigate Scanlan's disciplinary background at Loyola University prior to extending him an offer to join the SU Men's Lacrosse Team;

b) Failing to promptly and thoroughly investigate Plaintiff's complaints of domestic violence and sexual harassment;

c) Failing to properly notify, supervise, and train employees, agents, and representatives concerning their obligations under the Memorandum of Understanding with the Syracuse Police Department, specifically pertaining to domestic violence incidents;

d) Failing to properly notify and train employees, agents, representatives, and students concerning their obligations under Title IX and Article 129-B of NY CLS the New York Education Law (N.Y. Educ. Law 6443 et. seq.);

e)  Failing to discover and preserve evidence;

f)  Failing to prevent and remediate retaliation because Plaintiff engaged in protected activity;

g)  Failing to provide proper interim measures and accommodations to Plaintiff who engaged in protected activity;

h)  Failing to ensure that complaints of sexual harassment are adequately investigated, and fairly and timely adjudicated;

i)  Failing to ensure that students, staff, administrators, employees, agents, and representative are not engaging in retaliation forbidden by Title IX; and

j)  Continuing to employ unqualified employees, including DPS Officers and Title IX investigators.

418.     At all times relevant to the allegations contained in this complaint, Defendants knew, or in the exercise of reasonable care should have known, that their agents and employees were inadequately trained, lacked the requisite skill, and were not suited to conduct investigations and adjudication of claims of assault in a campus setting.

419.     As a direct and proximate result of Defendants' negligence, Plaintiff suffered damages.

## COUNT VI
## NEGLIGENCE (*Vicarious Liability/Respondeat Superior*)
## AGAINST DEFENDANT SU

420.     Plaintiff incorporates paragraphs 1 to 366 into this Count by reference as though fully restated herein.

421.     At all material times, Defendant SU's staff, including Defendant Wildhack, Defendant Desko, and SU DPS Officers, owed a duty of care to Defendant SU student-athletes, including Plaintiff.

422.     The duty of care owed to Plaintiff is outlined in Article 129-B of NY CLS Educ Law. The duties owed include a duty to hire competent personnel, adequately train personnel annually, adequately supervise personnel, and terminate or sanction personnel for inadequate performance.

423.     Defendant SU's staff, including Defendant Wildhack and Defendant Desko owed a duty of care to Plaintiff to ensure that their staff and personnel were properly trained and supervised.

424.     Defendant SU's staff, including Defendant Wildhack and Defendant Desko breached these duties of care and were negligent in their screening, hiring, training, supervision, disciplining, and retaining as follows:

a) Failing to thoroughly investigate Scanlan's disciplinary background at Loyola University prior to extending him an offer to join the SU Men's Lacrosse Team;

b) Failing to promptly and thoroughly investigate Plaintiff's complaints of domestic violence and sexual harassment;

c) Failing to properly notify, supervise, and train employees, agents, and representatives concerning their obligations under the Memorandum of Understanding with the Syracuse Police Department, specifically pertaining to domestic violence incidents;

d) Failing to properly notify and train employees, agents, representatives, and students concerning their obligations under Title IX and Article 129-B of NY CLS the New York Education Law (N.Y. Educ. Law 6443 et. seq.);

e) Failing to discover and preserve evidence;

f) Failing to prevent and remediate retaliation because Plaintiff engaged in protected activity;

g) Failing to provide proper interim measures and accommodations to Plaintiff who engaged in protected activity;

h) Failing to ensure that complaints of sexual harassment are adequately investigated, and fairly and timely adjudicated;

i) Failing to ensure that students, staff, administrators, employees, agents, and representative are not engaging in retaliation forbidden by Title IX;

j) Continuing to employ unqualified employees, including DPS Officers and Title IX investigators.

425.   At all times relevant to the allegations contained in this complaint, Defendants knew, or in the exercise of reasonable care should have known, that their agents and employees were inadequately trained, lacked the requisite skill, and were not suited to conduct investigations and adjudication of claims of assault in a campus setting;

426.   Plaintiff has suffered injury as a direct and proximate result of the breaches of the duties described above in this Cause of Action by defendant SU's staff, including Defendant Wildhack, Defendant Desko, and SU DPS officers.

427.     At all material times, Defendant SU employed – or otherwise exercised control as an employer over – SU staff, including Defendant Wildhack, Defendant Desko, and SU DPS officers.

428.     Defendant SU's staff, including Defendant Wildhack, Defendant Desko, and SU DPS officers, breached the duties described above in this Cause of Action while acting within the scope of their employment relationship with Defendant SU.

429.     By reasons of the foregoing, Defendant SU is liable under the doctrine of respondeat superior for the negligence of its staff, including Defendant Wildhack, Defendant Desko, and SU DPS officers, in breaching the duties described above in this Cause of Action.

430.     By reason of the foregoing, Defendant SU is liable to Plaintiff for compensatory damages and punitive damages, together with interest and costs.

**COUNT VII**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANT SU, DEFENANT DESKO, AND DEFENDANT WILDHACK**

431.     Plaintiff incorporates paragraphs 1 to 366 into this Count by reference as though fully restated herein.

432.     Defendants SU, Desko, and Wildhack owed a duty of care to Plaintiff.

433.     Defendants SU, Desko, and Wildhack knew that Plaintiff engaged in a protected activity by reporting sexual harassment on Defendant SU's campus.

434.     Despite their obligations under federal and New York state law and SU's Title IX Policy, Defendants failed to take prompt action to provide protective measures for Plaintiff which unreasonably endangered her physical safety and caused her to fear for her own safety.

435.     Due to Defendants SU, Desko, and Wildhack's negligence, Plaintiff was forced to relocate her housing following the Scanlan Assault as she remained in fear of encountering Scanlan yet was relocated only a few buildings away from her previous residence.

436.     Defendants SU, Desko, and Wildhack's actions were extreme and outrageous.

437.     Plaintiff suffered severe emotional harm as the result of Defendants SU, Desko, and Wildhack's breach of their duties.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff requests judgment in favor of the Plaintiff and against Defendants as follows:

A.  Awarding Plaintiff compensatory damages in an amount to be proven at trial;

B.  Awarding punitive damages in an amount to be proven at trial;

C.  Awarding prejudgment interest;

D.  Awarding Plaintiff reasonably incurred attorney's fees, costs, and disbursements expended in litigating this matter;

E.  Injunctive relief requiring Defendant SU to redress its violations of Title IX, including: (1) instituting, with the assistance of outside experts, and enforcing a comprehensive sexual harassment policy; (2) distributing written policies to all students describing prohibited activities and conduct and the consequences for violations; and (3) providing for annual, independent review by outside reviewers of Defendant SU's compliance with sexual harassment policies and Title IX guidance focusing in particular on Title IX guidance;

F.  Any such additional relief as the Court deems just, proper and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff respectfully demands a trial by jury as to all matters so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED: August 30, 2021

CALCATERRA POLLACK LLP
*/s/ Regina M. Calcaterra, Esq.*
Regina M. Calcaterra, Esq.
James Aliaga, Esq.
Anjori Mitra, Esq.

1140 Avenue of the Americas, 9th Floor
New York, New York 10036-5803
Phone: 212-899-1760
Fax: 332-206-2073
rcalcaterra@calcaterrapollack.com
jaliaga@calcaterrapollack.com
amitra@calcaterrapollack.com