**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JANE DOE,**

                           **Plaintiff,**

           **v.**

**SYRACUSE UNIVERSITY et al.,**

                         **Defendants.**

**5:21-cv-977**
**(GLS/ATB)**

_____

**APPEARANCES:**                 **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Calcaterra Pollack LLP         ANJORI MITRA, ESQ.
1140 Avenue of the Americas    JAMES ALIAGA, ESQ.
9th Floor                   REGINA M. CALCATERRA,
New York, NY 10036-5803      ESQ.

**FOR THE DEFENDANTS:**
Jenner, Block Law Firm - DC Office   DAVID DeBRUIN. ESQ.
1099 New York Avenue, Suite 900
Washington, DC 20001

Jenner & Block LLP          JEREMY M. CREELAN, ESQ.
1155 Avenue of the Americas
New York, NY 10036

**Gary L. Sharpe**
**Senior District Judge**

## <u>MEMORANDUM-DECISION AND ORDER</u>

### I. <u>Introduction</u>

Plaintiff Jane Doe commenced this action on August 30, 2021,

alleging violations of Title IX of the Civil Rights Act of 1964,[1] specifically deliberate indifference, hostile environment, and retaliation against defendant Syracuse University, as well as state law claims against defendants John Wildhack and John Desko.  (Compl., Dkt. No. 1.)  Now pending is defendants' motion to dismiss, (Dkt. No. 5), and Doe's cross-motion to strike certain documents submitted in connection with defendants' motion to dismiss, (Dkt. No. 26).  For the reasons that follow, defendants' motion is granted, Doe's cross-motion is denied as moot, and the complaint is dismissed.

## II.  Background[2]

At all relevant times, Doe was a student at Syracuse University and a member of the women's lacrosse team.  (Compl. ¶ 11.)  Wildhack was the Director of Athletics for Syracuse and Desko was the head coach of the Syracuse men's lacrosse team.  (*Id.* ¶¶ 15, 17.)

Beginning in February 2020, Doe, and Chase Scanlan, a member of the men's lacrosse team, began an "on-again-off-again relationship."  (*Id.* ¶

---

[1] *See* 20 U.S.C. §§ 1681-88.

[2]  Consistent with the applicable standard of review, the facts are drawn from Doe's complaint, (Dkt. No. 1), and presented in the light most favorable to her.

29.)  During this time, Scanlan shoved Doe to the ground, "aggressively

monitor[ed Doe]'s personal belongings to prevent [her] from controlling her

reproductive health," stalked Doe, entered her bedroom without her

permission in the middle of the night, abused and threatened to kill his dog

in Doe's presence, and stole and damaged Doe's personal property.  (*Id.* ¶

30.)

On January 4, 2021, Doe met with an unnamed assistant coach of

the women's lacrosse team (hereinafter, "the Assistant Coach") and

informed her of these incidents, along with the fact that Scanlan had

physically assaulted members of the men's lacrosse team, sold marijuana

to Syracuse students, and that she felt threatened by his behavior.  (*Id.*

¶¶ 38-40.)  After this meeting, and after discussing the matter with one of

Doe's parents, the Assistant Coach informed Gary Gait, then the head

coach of the women's lacrosse team, of her conversation with Doe.  (*Id.* ¶¶

42-44.)  Gait notified Deputy Athletics Director/Senior Woman

Administrator Kimberly Keenan-Kirkpatrick.  (*Id.* ¶ 44.)

On January 5, 2021, the Assistant Coach told Doe that the

information she provided regarding Scanlan's behavior had been

forwarded to Syracuse's Title IX Office.  (*Id.* ¶ 45.)  The Title IX Office

3

reached out to Doe that same day, sending her an email "containing a copy of S[yracuse]'s Sexual Harassment Prevention Policy, information about resources on campus (safety escorts, counseling, etc.), . . . information about the process for filing informal and formal complaints," and informed Doe that she would be assigned a "Case Manager."  (*Id.* ¶ 46.)

On January 8, 2021, Doe had a video call with a Case Coordinator from the Title IX Office, Gina Kelepurovski, who advised Doe that she could seek a "No Contact Order" (NCO) or file a formal complaint against Scanlan.  (*Id.* ¶¶ 47-50.)  Doe opted for an NCO, which was put in place on January 22, 2021, and did not pursue a formal complaint against Scanlan. (*Id.* ¶¶ 50-51, 54.)  After "feeling a mix of confusion, guilt, and coercion as a result of manipulation by Scanlan," Doe later requested that the NCO be rescinded.  (*Id.* ¶ 60.)  In March 2021, the Title IX Office contacted Doe and "asked [her] questions sufficient to confirm that [she] . . . wanted the [NCO] removed and whether [she] felt safe," and then rescinded the NCO. (*Id.* ¶¶ 62-64.)

On the night of April 17, 2021, while Doe was in her apartment and "using her cell phone . . . for a video call with" a male student, Scanlan

4

arrived, demanded to see Doe's cell phone, and asked who she was talking to.  (*Id.* ¶¶ 68, 70.)  Doe then locked herself in her bathroom "and began deleting details from [her c]ell [p]hone that would have angered Scanlan."  (*Id.* ¶ 71.)  Scalan then started "pounding and kicking the bathroom door while yelling" at Doe.  (*Id.* ¶ 72.)  Doe ultimately unlocked the door, and, when she did, Scanlan pushed it open into her, knocking her down.  (*Id.* ¶ 73.)  "During these events, [Doe's] apartment wall near the bathroom was damaged leaving a large hole in the wall," however, "[a]s a result of her trauma, [Doe] cannot recall . . . exactly what caused the hole in the wall," but Scanlan later admitted to causing it.  (*Id.* ¶ 74, 126.)  After gaining access to the bathroom, Scanlan took the cell phone from Doe and threw it into the toilet, and after Doe removed it he took it again and left her apartment.  (*Id.* ¶¶ 76, 80.)  Doe followed Scalan in an attempt to regain her cell phone from him, but Scanlan threw the cell phone onto the ground, breaking it.  (*Id.* ¶ 81.)

    Doe then followed Scanlan to his apartment, and inside, after Scanlan threw her cell phone to the ground again, Doe tried to strike him.  (*Id.* ¶¶ 83, 84.)  In response, "Scanlan caught [Doe]'s arm, spun her as they fell on his bed, and then restricted [her] by restraining [her] legs with

his own legs and squeezed her torso with his arms to the point that [she] had difficulty breathing and was crying out from the pain." (*Id.* ¶ 85.) During this time Doe feared for her life. (*Id.* ¶ 86.) Scanlan ultimately released her. (*Id.* ¶ 87.) After being released, Doe remained crying on Scanlan's bed and was in such pain that she believed Scanlan had broken her ribs. (*Id.* ¶ 88.)

The following day, Doe's sister and mother "learned that [her] apartment wall had been damaged" and tried to contact her, however, they were unable to do so because Scanlan had broken her cell phone the night before. (*Id.* ¶ 91.) They, in turn, alerted Syracuse, which ultimately resulted in Syracuse Department of Public Safety (DPS) Officers going to Doe's apartment and interviewing her, Scanlan, and her roommate. (*Id.* ¶¶ 91, 107, 112.)

DPS interviewed Doe in close proximity of Scanlan, who could hear her responses, began the interview by chastising Doe for breaking school policy by having Scanlan's dog in her dormitory, told her "that she was being recorded," that she "better tell [them] the truth," and told Scanlan that Doe's roommate had implicated him in the destruction of Doe's cell phone. (*Id.* ¶¶ 113, 115-16, 119-120.) After Doe expressed that she wanted to be

6

questioned away from Scanlan, she revealed to them what had happened the night before.  (*Id.* ¶¶ 122-23.)  DPS then told Scanlan that Doe had provided them with this information, and that it contradicted the narrative he had been providing them.  (*Id.* ¶¶ 124, 130.)  Scanlan admitted his actions to DPS.  (*Id.* ¶¶ 125-128.)  At the conclusion of the interview, and in front of Scanlan, Syracuse DPS asked Doe "[d]o you want him arrested?", and Doe declined.  (*Id.* ¶¶ 135-36.)  The manner in which DPS conducted this interview caused both Doe and her roommate to fear for their safety, and "multiple employees of [Syracuse] proceeded to apologize to [Doe] and her [m]other for how DPS handled the on-scene investigation." (*Id.* ¶¶ 120-21, 131-33, 146.)

After the conclusion of the interview, another NCO was issued for Doe.  (*Id.* ¶ 138.)  However, despite a memorandum of understanding that required DPS "to make . . . mandatory notifications to [the Syracuse Police Department]'s Abused Persons Unit (APU) and the Onondaga County [District Attorney]'s Office in cases of . . . domestic violence," DPS did not do so until "over a week" after they interviewed Doe.  (*Id.* ¶¶ 148-52.)

On Monday, April 19, 2021, the Title IX Office emailed Doe regarding the assault and detailed how Doe may proceed.  (*Id.* ¶ 162.)  On, April 22,

2021, Doe met with members of the Title IX Office, to discuss her "options under S[yracuse]'s Title IX procedures."  (*Id.* ¶ 164.)  "At the end of the meeting, it was agreed upon that [Doe] would take time to decide if [she] wanted to file a formal Title IX complaint against Scanlan."  (*Id.* ¶ 173.)

On April 26 and 27, 2021, Doe again discussed with members of the Title IX Office the possibility of her pursuing a formal Title IX complaint. (*Id.* ¶¶ 183, 189-90.)  After the procedures of pursuing a formal complaint were fully explained to her, and, "[a]lthough . . . interested in pursuing a Title IX formal complaint against Scanlan, [because she] was concerned about . . . S[yracuse]'s requirement that as part of the formal complaint procedure, she would have to attend the same . . . meeting as Scanlan," and that she could potentially be confronted by his representative during the process, Doe elected not to do so.  (*Id.* ¶¶ 183, 189-90, 192 ,195.)  The Title IX Office also informed Doe that it could pursue a formal complaint against Scanlan on behalf of Syracuse, which it ultimately did.  (*Id.* ¶¶ 191, 196.)

Some time after the April 2020 assault and subsequent investigation, Doe "began considering entering the National Collegiate Athletic Association . . . Transfer Portal," and informed one of her coaches of this.

(*Id.* ¶¶ 258-59.)  Keenan-Kirkpatrick thereafter emailed Doe and told her

that she wanted to have a conversation with her regarding Doe's decision

to enter the Transfer Portal.  (*Id.* ¶ 260.)  During this conversation, Kennan-

Kirkpatrick mentioned that she was aware of the assault by Scanlan, and

asked [Doe] if that was the reason she was exploring the possibility of

transferring.  (*Id.* ¶ 262.)  Doe stated that it was not, and then inquired as

to whether she would retain her scholarship if she entered the transfer

portal.  (*Id.* ¶¶ 262-65.)  Keenan-Kirkpatrick told Doe that it was "the

S[yracuse] Athletics Program's policy that scholarships can be rescinded

when students enter the [T]ransfer [P]ortal" but that it "usually" only

rescinds scholarship money "where student athletes enter the transfer

portal and leave S[yracuse] in a 'nasty way' or 'burn[] bridges' with the

school."  (*Id.* ¶¶ 265-66.)  Doe took this, along with Keenan-Kickpartick's

mention of events involving Scanlan, to mean "that [her] scholarship would

be jeopardized should she pursue legal action" against Syracuse.  (*Id.* ¶

268.)

Shortly thereafter, Doe had a conversation with the new head coach

of the Syracuse women's lacrosse team to discuss her future there.  (*Id.*

¶ 275.)  After informing the new coach that she was considering leaving

Syracuse and transferring to a new school, the new coach "encouraged [her] to think about leaving S[yracuse]," told her to "talk to [he]r parents and do what makes [her] happy," "further implied that [she] should not return to S[yracuse] by asking if [she] was happy when [she] visited her family's home," told her that "[i]f [she] didn't feel safe, maybe [she] d[id]n't want to come back" to Syracuse, volunteered to speak to other schools on her behalf, and "asked [her] . . . if [she] was moving forward with any legal proceedings." (*Id.* ¶¶ 279-83.)

Shortly after Scanlan assaulted Doe, he was suspended from the men's lacrosse team, but was subsequently reinstated approximately one week later. (*Id.* ¶¶ 177-78.) The decision to reinstate Scanlan was partially justified to Doe's parents by Wildhack, who "stat[ed] that part of the benefit of reinstating Scanlan was that there would be more eyes on [him] and his whereabouts would be additionally monitored by his reporting to lacrosse practice." (*Id.* ¶ 215.) Further, it was explained to Doe's parents that the Syracuse Threat Assessment and Management Team (TAMT) had determined "that Scanlan's behavior did not warrant any official action or suspension," based on "several factors" one of which being that, at the time, Doe was not on Syracuse's campus "so there was

no longer a threat to [her] safety."  (*Id.* ¶¶ 206-07.)  On May 7, 2021,

Scanlan was arrested "on charges relating to the domestic altercation with

[Doe]."  (*Id.* ¶ 239.)

### III.  <u>Standard of Review</u>

The standard of review under Fed. R. Civ. P. 12(b)(6) is well settled

and will not be repeated here.  For a full discussion of the governing

standard, the court refers the parties to its prior decision in *Ellis v. Cohen &*

*Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010), *abrogated on*

*other grounds by Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191

(2d Cir. 2015).

### IV.  <u>Discussion</u>

As a preliminary matter, Doe cross-moves to strike "unauthenticated

documents" submitted with defendants' motion to dismiss because she

argues that they are improperly before the court at this juncture.  (Dkt.

No. 26 at 5-8.)  Without deciding whether these documents are properly

before the court, because the court need not, and has not, *see* Fed. R. Civ.

P. 12(d), considered these documents in order to resolve the pending

motion to dismiss, Doe's motion is denied as moot.

Turning to the pending motion to dismiss, defendants argue that

Doe's deliberate indifference and hostile environment claims must be dismissed because their actions were not "clearly unreasonable in light of the known circumstances."  (Dkt. No. 5, Attach. 1 at 16-23.)  Additionally, they assert that Doe's retaliation claim must be dismissed because she did not face any adverse action.  (*Id.* at 23-25.)  Finally, they contend that, because Doe's federal claims are subject to dismissal, the court should decline to exercise supplemental jurisdiction over Doe's state law claims. (*Id.* at 25.)

Doe counters that the manner in which defendants proceeded both after she originally reported Scanlan's dangerous behavior towards her, but before he assaulted her, as well as their actions after the assault were both clearly unreasonable.  (Dkt. No. 26 at 10-20.)  With respect to her retaliation claim, Doe argues that the comments made by Keenan-Kirkpatrick and the new coach of the women's lacrosse team constitute adverse actions, as well as the way in which Syracuse investigated Doe's assault.  (*Id.* at 22-25.)

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance."  20 U.S.C. § 1681(a).

Title IX provides a private right of action against a federally-funded education institution based on peer sexual harassment "where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities."  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).  To make out a prima facie case of deliberate indifference, a plaintiff must allege three elements: (1) "sexual harassment . . . that is so severe, pervasive, and objectively offensive that it" deprived the plaintiff of "access to the educational opportunities or benefits provided by the school"; (2) the school had "actual knowledge" of the harassment; and (3) the school was "deliberately indifferent to the harassment."  *Id.* at 650.

A defendant acts with deliberate indifference both when its response to known harassment "is clearly unreasonable in light of the known circumstances, and when remedial action only follows after a lengthy and unjustified delay."  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003) (internal quotation marks and citations omitted).  "Deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it."  *Davis*, 526 U.S. at 645 (internal

quotation marks, alterations, and citations omitted).  "Only actual notice by

an 'appropriate person' who can rectify a violation of Title IX can support a

claim under Title IX."  *Bliss v. Putnam Valley Cent. Sch. Dist.*, No. 7:06-cv-

15509, 2011 WL 1079944, at *5 (S.D.N.Y. Mar. 24, 2011) (citing *Gebser v.

Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

To make out a claim for hostile environment "[a] Title IX plaintiff must

show that [s]he subjectively perceived the environment to be hostile or

abusive and that the environment objectively was hostile or abusive, that

is, that it was permeated with discriminatory intimidation, ridicule, and insult

sufficiently severe or pervasive to alter the conditions of h[er] educational

environment."  *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633

F.3d 81, 89 (2d Cir. 2011) (citations omitted).  "For an educational facility to

be liable," a plaintiff must demonstrate that it "failed to adequately respond"

by either "provid[ing] no response or . . . provid[ing] a response that

'amount[s] to deliberate indifference."  *See Novio v. N.Y. Acad. of Art*, 286

F. Supp. 3d 566, 576 (S.D.N.Y. 2017) (quoting *Papelino*, 633 F.3d at 89).

"[R]etaliation against individuals because they complain of sex

discrimination is intentional conduct that violates the clear terms of [Title

IX]."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005)

(internal quotation marks and citation omitted).  To establish a prima facie case of Title IX retaliation, a plaintiff must show: "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action."  *Papelino*, 633 F.3d at 91 (citation omitted).  "Close temporal proximity between the plaintiff's protected activity and the . . . adverse action may in itself be sufficient to establish the requisite causal connection."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  In the context of Title IX, an adverse action constitutes "action of a nature that would deter a reasonable [student] from making or supporting a discrimination claim."  *Shalom v. Hunter Coll. of City Univ. of N.Y.*, No. 13-cv-4667, 2014 WL 3955167, at *5 (S.D.N.Y. Aug. 13, 2014).

Doe's pre-assault cause of action for deliberate indifference against Syracuse must be dismissed.  Syracuse fully informed Doe of her rights under Title IX after she informed them of Scanlan's dangerous behavior, including her ability to file an official complaint, and the fact that she could have an NCO put in place, a right she chose to exercise, (Compl. ¶¶ 46, 50), all in accordance with the Department of Education's Title IX

regulations, *see* 34 C.F.R. § 106.44(a) ("A recipient with actual knowledge of sexual harassment . . . . must treat complainants . . . equitably by offering supportive measures . . . .  The Title IX Coordinator must promptly contact the complainant to discuss the availability of supportive measures . . . , consider the complainant's wishes with respect to supportive measures, inform the complainant of the availability of supportive measures with or without the filing of a formal complaint, and explain to the complainant the process for filing a formal complaint.").  While Doe bases this claim, in part, on the fact that Syracuse failed to inform her that it had the ability to independently investigate Scanlan, nor did it do so after she declined to make a formal complaint, (Dkt. No. 26 at 8-16), that course of action does not amount to deliberate indifference.  *See Abramova v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, 278 F. App'x 30, 31 (2d Cir. 2008) (finding no deliberate indifference where university became aware of a report of sexual harassment and university responded by "sen[ding plaintiff] a letter that . . . indicated that there existed procedures pursuant to which allegations of harassment could be brought to the school's attention," but took no further action, after plaintiff did not respond to this letter).

Additionally, to the extent Doe seeks to support this cause of action

by arguing that Syracuse rescinded her NCO "[i]n [a] [d]eliberately

[i]ndifferent [m]anner," (Dkt. No. 26 at 13), Syracuse only rescinded the

NCO after "ask[ing] [Doe] questions sufficient to confirm that [she] . . .

wanted the [NCO] removed and . . . felt safe," (Compl. ¶ 63), which

demonstrate that the decision was not clearly unreasonable. *See Prasad*

*v. George Washington Univ.*, 390 F. Supp. 3d 1, 26 (D.D.C. 2019) (finding,

where a university "imposed [an] NCO within a week of plaintiff's . . . report

[of harassment],  . . . g[a]ve[ plaintiff the university's] emergency and

Victims' Services contact information twice," and only rescinded the NCO

after plaintiff requested to have it rescinded, that the university was "not

deliberately indifferent to plaintiff's needs"); *see also* 34 C.F.R. § 106.44(a)

("A recipient with actual knowledge of sexual harassment . . . must . . .

consider the complainant's wishes with respect to supportive measures.").

Accordingly, Doe's pre-assault cause of action for deliberate indifference is

dismissed.

Similarly, Doe's post-assault cause of action for deliberate

indifference against Syracuse must also be dismissed.  Although, based on

the complaint, DPS's actions in investigating Doe's assault could be viewed

as inadequate, ineffective, and could have placed Doe or her roommate's

safely in jeopardy, (Compl. ¶¶ 113, 115-16, 119-120, 122-28, 130, 135-36),

Doe's allegations do not suffice to establish deliberate indifference on

behalf Syracuse, because DPS does not qualify as "an appropriate person

who can rectify a violation of Title IX." *See Kesterson v. Kent State Univ.*,

967 F.3d 519, 529 (6th Cir. 2020) (finding that actions by school

employees not "high enough up the chain-of-command that [their]

decision[s] constitute[] the school's decision[s]" do not constitute "the

actions of [the school] or failures to respond by" the school (internal

quotation marks and citation omitted)); *see also Ross v. Univ. of Tulsa*, 859

F.3d 1280, 1288-92 (10th Cir. 2017) (finding that campus security officers

were not appropriate persons who could rectify a Title IX violation).

Additionally, while Doe contends that Syracuse "initially failed to

report [her assault by Scanlan] to the Syracuse Police Department . . .  and

the Onondaga County District Attorney, in violation of its Memorandum of

Understanding" with these agencies, it is clear from the complaint that

these agencies were notified approximately one week later.  (Compl. ¶

150.)  While "[a] defendant acts with deliberate indifference . . . when

remedial action only follows after a lengthy and unjustified delay," *Hayut v.

State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003) (internal quotation

marks and citations omitted), a delay of approximately one week is not

sufficient to constitute deliberate indifference, *see Roskin-Frazee v.*

*Columbia Univ.*, No. 17 Civ. 2032, 2018 WL 6523721, at *9 (S.D.N.Y. Nov.

26, 2018) ("[A] lapse of a month before [d]efendant contacted [plaintiff to

open an investigation into her claims] was not clearly unreasonable.").

Additionally, while the Syracuse Police Department and the Onondaga

County District Attorney did not become involved until approximately one

week after Doe reported her assault, Syracuse investigated her claims and

took remedial action immediately.  (Compl. ¶ 112.)

Finally, although Doe points to the fact that "[d]efendants' . . .

reinstate[d] Scanlan on the [l]acrosse team" and that TAMT "determined

that [Scanlan]'s behavior did not warrant any official action or suspension

from [Syracuse] overall," (Dkt. No. 26 at 18-19), complainants "do not have

a right to specific remedial measures," and "when weighing the adequacy

of a response, a court must accord sufficient deference to the decisions of

school disciplinarians."  *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655,

666 (2d Cir. 2012) (citation omitted); *see Davis*, 526 U.S. at 648 ("[C]ourts

should refrain from second-guessing the disciplinary decisions made by

school administrators." (citation omitted)).  Accordingly, Doe's post-assault

deliberate indifference claim against Syracuse is dismissed.[3]

Regarding her retaliation claim, Doe's conversation with the new coach does not constitute adverse action.  Doe alleges that, after informing the new coach that she was considering leaving Syracuse and transferring to a new school, the new coach "encouraged [her] to think about leaving S[yracuse]," told her to "talk to [he]r parents and do what makes [her] happy," "further implied that [she] should not return to S[yracuse] by asking if [she] was happy when [she] visited her family's home," told her that "[i]f [she] didn't feel safe, maybe [she] d[id]n't want to come back" to Syracuse, volunteered to speak to other schools on her behalf, and "asked [her] . . . if [she] was moving forward with any legal proceedings."  (Compl. ¶¶ 279-83.)  No reasonable jury could find that the new coach's statements constitute "action of a nature that would deter a reasonable [student] from making or supporting a discrimination claim."[4]  *Shalom*, 2014 WL 3955167,

---

[3]  Because Doe does not allege that Syracuse failed to act in response to her assault or pre-assault report regarding Scanlan, nor has she sufficiently alleged that its actions constituted deliberate indifference, her hostile environment claim, based on the same facts, (Compl. ¶¶ 397), must also be dismissed.  *See Novio*, 286 F. Supp. 3d at 576 ("[F]or an educational facility to be liable [for hostile environment], the plaintiff must establish that [it] . . . failed to adequately respond" to the hostile environment by either "provid[ing] no response or . . . provid[ing] a response that 'amount[s] to deliberate indifference." (quoting *Papelino*, 633 F.3d at 89)).

[4]  While Doe argues in her response that "it is more plausible than not that [the New Coach] received direction from superiors to discourage [Doe] from staying at S[yracuse] and

20

at *5.

Similarly, and while it is unclear what Title IX protected activity for which Doe is claiming she was retaliated against,[5] no statement by Keenan-Kirkpatrick constitutes adverse action.  During her conversation with Kennan-Kirkpatrick, Doe specifically stated that she *was not* considering transferring due to Scanlan, but rather due to playing time. (Compl. ¶¶ 262-63.)  Further, Keenan-Kirkpatrick's statement that Syracuse "usually" rescinds scholarship money "where student athletes enter the transfer portal and leave S[yracuse] in a 'nasty way' or 'burn[] bridges' with the school," was only made after Doe raised the issue of her athletic scholarship, (Compl. ¶ 264), and Doe makes no allegation that this was not an accurate explanation of the Syracuse Athletic Department's policy regarding the athletic scholarships of those who enter the transfer portal, (*see generally* Compl.).  Although close, no reasonable jury could find that Keenan-Kirkpatrick's statements, in whole, and in context,

---

learn about potential legal action," (Dkt. No. 26 at 23), she provides no support for this beyond pure speculation, (Compl. ¶ 291 ("[Doe] is left to believe [the new coach's statements to her] came directly from [Syracuse Athletics Department leadership].").)

[5] *Compare* Dkt. No. 26 at 23 (arguing that Keenan-Kirkpatrick's statement "carried the suggestion that if [Doe] pursued [future] legal action, her scholarship prospects would be at risk"), *with* (Compl. ¶¶ 404-11 (alleging that the protected activity Doe was retaliated against for was "report[ing] that she was assaulted")).

constitute "action of a nature that would deter a reasonable [student] from making or supporting a discrimination claim." *Shalom*, 2014 WL 3955167, at *5. Accordingly, Doe's claim of retaliation is dismissed.[6]

Finally, with respect to Doe's state law claims, (Compl. ¶¶ 412-37), the court declines to exercise supplemental jurisdiction over them. "Although a federal court has discretion to retain jurisdiction over state law claims after the dismissal of the federal claims that created original jurisdiction, 'where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.'" *Clark v. Dominique*, 798 F. Supp. 2d 390, 408 (N.D.N.Y. 2011) (quoting *Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006)).

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants motion to dismiss (Dkt. No. 5) is **GRANTED**; and it is further

---

[6] Doe's claim that Syracuse's response to her assault constitutes an adverse action, (Dkt. No. 26 at 24-25), is equally unpersuasive. *See Ragin v. East Ramapo Cent. Sch. Dist.*, No. 05 Civ. 6496, 2010 WL 1326779, at *18 (S.D.N.Y. Mar. 31, 2010) ("The law is clear . . . that . . . a failure to investigate [complaints of sexual harassment] does not, in and of itself, constitute an adverse employment action in the retaliation context) (Title VII case); *see Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013) ("Title VII and Title IX are governed by the same substantive standard[] for reviewing claims of . . . retaliation." (Citation omitted)).

**ORDERED** that Doe's cross-motion to strike (Dkt. No. 26) is **DENIED** as moot; and it is further

**ORDERED** that the complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to close the case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

September 7, 2022
Albany, New York

Gary L. Sharpe
U.S. District Judge