UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JANE DOE,[1]

                           Plaintiff,

                  -v-                 5:21-CV-977

SYRACUSE UNIVERSITY,
JOHN WILDHACK, JOHN DESKO,
KIMBERLY KEENAN-KIRKPATRICK,
and KAYLA TREANOR,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                  OF COUNSEL:

CALCATERRA LAW PC         ANJORI MITRA, ESQ.
Attorneys for Plaintiff         REGINA M. CALCATERRA, ESQ.
1140 Avenue of the Americas, 9th Floor
New York, NY 10036

JENNER & BLOCK LLP        DAVID DEBRUIN, ESQ.
Attorneys for Defendants      JEREMY M. CREELAN, ESQ.
1099 New York Avenue, Suite 900  LAUREN J. HARTZ, ESQ.
Washington, DC 20001        ALLISON N. DOUGLIS, ESQ.


DAVID N. HURD
United States District Judge

---

[1] Plaintiff's request to proceed under a pseudonym, Dkt. No. 4, was granted on September 1, 2021. Dkt. No. 6.

## DECISION and ORDER

## I. INTRODUCTION

On August 30, 2021, plaintiff Jane Doe ("Doe" or "plaintiff") commenced this lawsuit against defendants Syracuse University ("Syracuse U"), John Wildhack ("Wildhack"),  John Desko ("Desko"), Kimberly Keenan-Kirkpatrick ("Keenan-Kirkpatrick"), and Kayla Treanor ("Treanor") (collectively "defendants").  Dkt. No. 1.  Plaintiff's complaint asserted claims for sex discrimination and retaliation in violation of Title IX, negligence, and negligent infliction of emotional distress spurring from a domestic violence incident between her and another student named Chase Scanlan.  *Id.*

On August 31, 2021, defendants moved pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss Doe's complaint in its entirety.  Dkt. No. 5.  That motion was granted and a judgment was entered accordingly on September 7, 2022.[2]  Dkt Nos. 32–33.

Thereafter, plaintiff appealed.  Dkt. No. 34.  The Second Circuit affirmed the dismissal of her sex discrimination claims but vacated and remanded for further proceedings on retaliation claim.  Dkt. No. 36.

On February 26, 2024, pursuant to a stipulation, Doe filed an amended complaint asserting claims for retaliation under Title IX and the New York

[2] This case was originally assigned to, and proceeded before, Senior U.S. District Judge Gary L. Sharpe before it was reassigned to U.S. District Judge David N. Hurd on February 21, 2024.  Dkt. No. 52.

2

State Human Rights Law (the "NYSHRL"), breach of contract, negligence, negligent infliction of emotional distress.  Dkt. No. 56.  Defendants have moved pursuant to Rule 12(b)(6) to dismiss plaintiff's breach of contract and negligence claims for failure to state a claim on March 18, 2024.  Dkt. No. 61.

The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.[3]  Dkt. Nos. 63, 67, 68.

## II. <u>BACKGROUND</u>

Doe accepted an offer of admission to attend Syracuse U after being recruited to play for the Syracuse U Women's Lacrosse Team ("Women's Lacrosse Team").[4]  Am. Compl. ¶¶ 11–12.  Plaintiff lived in student housing on Syracuse U's South Campus.  *Id.* ¶ 12.  Chase Scanlan ("Scanlan") transferred from Loyola University to join the Syracuse U Men's Lacrosse Team ("Men's Lacrosse Team") in the fall of 2020.  *Id.* ¶¶ 25–26.  Like plaintiff, Scanlan also resided on campus in student housing.  *Id.* ¶ 85.

In February 2020, Doe and Scanlan began what plaintiff describes as an "on-again-off-again" relationship.  Am. Compl. ¶ 31.  According to plaintiff, she suffered various incidences of domestic violence at the hands of Scanlan, including physical assault, stalking, and theft.  *Id.* ¶ 32.

---

[3] Defendants' request for oral argument is denied as moot.  *See infra.*

[4] Plaintiff's complaint is silent as to when she matriculated or accepted her offer to attend Syracuse U and play lacrosse there.

After a year of abuse, Doe requested a meeting with one of the Women's Lacrosse Team Assistant Coaches to discuss Scanlan's behavior towards her. Am. Compl. ¶ 42.  During their meeting, plaintiff informed her coach of Scanlan's abuse.  *Id*. ¶.  In turn, plaintiff's coach reported Scanlan's behavior to the Women's Lacrosse Team Head Coach, who in turn notified Keenan-Kirkpatrick.  *Id*. ¶ 46.  Plaintiff also met with Syracuse U's Title IX Coordinator Kelepurovski ("Kelepurovski") to discuss Scanlan's violent behavior.  *Id*. ¶¶ 51, 53.  After their meeting, Kelepurovski helped plaintiff obtain a "No Contact Order" ("NCO") against Scanlan.  *Id*.  The NCO went into effect on January 22, 2021.  *Id*.

However, soon after receiving the NCO, Doe sought to remove it.  Am. Compl. ¶ 62.  According to plaintiff, she felt "a mix of confusion, guilt, and coercion" that prompted her to initiate the process of removing the NCO.  *Id*. The NCO was officially removed as of March 8, 2021.  *Id*. ¶ 67.

On April 17, 2021, Doe was in her on-campus apartment video-calling with another male student when she saw Scanlan outside of her window.  Am. Compl. ¶ 71.  When Scanlan knocked on her door, plaintiff let him into her apartment.  *Id*. ¶¶ 72–74.  Scanlan began questioning plaintiff immediately about who she was video-calling.  *Id*.

Doe then locked herself in her bathroom with her cellphone.  Am. Compl. ¶¶ 74–75.  In response, Scanlan began kicking the door and yelling at her to

let him in.  *Id.*  As plaintiff unlocked the bathroom door, Scanlan pushed it open and caused her to fall to the ground.  *Id.* ¶¶ 75–76.[5]  At some point, Scanlan picked up Doe's cellphone and dropped it into the toilet.  *Id.* ¶ 79.  When Doe removed her cellphone from the toilet, Scanlan snatched it from her hands and answered an incoming call from her roommate asking to be let into the apartment.  *Id.* ¶¶ 80–82.  Scanlan let plaintiff's roommate in but refused to her into the bathroom to check on plaintiff.  *Id.*

Thereafter, Scanlan left Doe's apartment and began to walk to his own apartment a few buildings away, with plaintiff's cellphone in hand.  Am. Compl. ¶ 83.  As plaintiff followed Scanlan to retrieve her cellphone, Scanlan threw it to the ground, shattering the screen.  *Id.* ¶ 84.  Upon observing the damage, Doe continued following Scanlan into his apartment, yelling that he should buy her a new cellphone.  *Id.* ¶ 85.

When the pair arrived at Scanlan's apartment, he threw Doe's cellphone on the floor again—causing further damage.  Am. Compl. ¶ 86.  Angered by Scanlan's actions, plaintiff swung at him.  *Id.* ¶¶ 88–89.  When plaintiff missed Scanlan, he grabbed her arm and spun her around, causing the two of them to fall onto his bed with his body on top of hers.  *Id.*  Scanlan then restricted plaintiff's legs with his legs and torso with his arms to the point

---

[5]  At some point, there was damage caused to the wall near the bathroom, leaving a hole in the sheetrock.  Am. Compl. ¶ 77.  According to Doe, she cannot remember what transpired to cause the damage.  *Id.*

that she had difficulty breathing and cried out in pain. *Id.* After Scanlan released her, Doe remained on the bed in pain and crying—believing that Scanlan had cracked her ribs. *Id.* ¶ 91. Despite this, plaintiff was unable to call the police to report the incident due to her damaged cellphone. *Id.* ¶ 92.

The following day, Doe's mother learned of the damage to her apartment wall. Am. Compl. ¶ 94. But plaintiff's mother was unable to get into contact with her daughter because of the broken cellphone. *Id.* As an alternative, plaintiff's mother contacted the Women's Lacrosse Assistant Coach. *Id.* ¶¶ 93, 94. A chain reaction followed: Plaintiff's Assistant Coach notified the Associate Athletic Trainer, who contacted the Director of Syracuse U's Department of Emergency Management and the Director of Operations for the Men's Lacrosse Team, Roy Simmons III ("Simmons"). *Id.* ¶¶ 95, 96.

The same day, Scanlan took Doe to the Apple Store to replace her cellphone. Am. Compl. ¶ 97. On their way home from the store, Simmons called Scanlan and to ask if he could speak with plaintiff. *Id.* ¶¶ 101, 103. Scanlan gave the phone to plaintiff. *Id.* During their conversation, Simmons asked if it was true that plaintiff's cellphone was broken, which plaintiff confirmed. *Id.* ¶¶ 104, 105. Simmons informed plaintiff that Syracuse U was looking for her and asked her to call the Director of the Department of Emergency Management. *Id.* ¶ 106.

Doe called the number as instructed.  Am. Compl. ¶ 108.  But when plaintiff spoke with the Department of Emergency Management, she was only asked a single question about her status and did not provide further counseling or assistance.  *Id*. ¶ 109.

When Doe and Scanlan returned to campus,  Syracuse U Department of Safety ("DPS") personnel were present at plaintiff's apartment and were in the process interviewing her roommate.  Am. Compl. ¶ 110.  DPS began interviewing Doe about the altercation within earshot of Scanlan.  *Id*. ¶ 116. Aware that Scanlan could hear her, plaintiff first denied that Scanlan had broken her cellphone.  *Id*. ¶ 121.  But when plaintiff spoke to DPS away from Scanlan, she confirmed that Scanlan had in fact smashed her cellphone.  *Id*. ¶¶ 126, 127.  Plaintiff did not, however, report Scanlan's physical assault.  *Id*. ¶ 145.

When one of the DPS personnel asked Doe if she would like Scanlan to be arrested, plaintiff declined.  Am. Compl. ¶ 139.  DPS then relayed plaintiff's accusations to Scanlan, who admitted that he had smashed plaintiff's cellphone and caused the hole in her apartment wall.  *Id*. ¶¶ 127, 129, 130.

After the parties left the scene, DPS returned to Doe's apartment to give her a second NCO against Scanlan and a pamphlet about domestic violence. Am. Compl. ¶ 144.  When a DPS detective spoke to plaintiff's mother, she informed him of Scanlan's history of abusive behavior towards her daughter.

*Id.* ¶ 164.  That evening, Doe's mother picked her up from her residence to stay with her family off-campus.  *Id.* ¶ 162.

The next day, Doe received an email from Kelepurovski with options on how to proceed.  Am. Compl. ¶ 165.  Plaintiff met with Kelepurovski and a case manager on April 22, 2021.  *Id.* ¶ 167.  During this meeting, plaintiff informed them of reports of Scanlan's violent behavior against other Syracuse U students.[6]  *Id.* ¶¶ 169, 170–71.  Kelepurovski explained the process for filing a formal Title IX complaint to plaintiff, which would have required her to discuss the allegations in front of Scanlan (via video-call or in person.)  *Id.* ¶¶ 173, 175.  At the meeting's end, the parties agreed that plaintiff would take time to decide if she wanted to go through with her complaint.  *Id.* ¶ 176.

On April 26, 2021, Doe emailed Kelepurovski to arrange another call concerning her potential Title IX complaint.  Am. Compl.  ¶ 186.  Specifically, she raised concerns about the requirement to discuss allegations in front of Scanlan.  *Id.*  The following day, plaintiff met by video call with Kelepurovski and Title IX Officer Johnson-Willis ("Johnson-Willis").  *Id.* ¶ 192.  Johnson-Willis explained that the formal complaint would require a virtual proceeding in front of Syracuse U's Title IX staff and Scanlan, and that plaintiff would be

---

[6]  These incidents included two other female Syracuse U students who claimed that Scanlan had assaulted them, Scanlan striking a teammate in the head, and punching a freshman member of the Men's Lacrosse Team.  Am. Compl. ¶¶ 170−71.

questioned by Scanlan's advisor. *Id.* Johnson-Willis also said that Syracuse U could file a formal complaint on their own behalf. *Id.* ¶ 194. Plaintiff indicated that she was uncomfortable with being on the same call as Scanlan. *Id.* ¶ 195.

Around April 27, 2021, Doe's mother and stepfather spoke on the phone with Syracuse U Deputy General Counsel Gabe Nugent ("Nugent"). Am. Compl. ¶ 208. Nugent indicated that the Syracuse U Threat Assessment and Management Team had determined Scanlan's behavior did not warrant any official action or suspension. *Id.* ¶ 209. Nugent stated this decision was based on "several factors" including that plaintiff had removed herself from the Syracuse U campus. *Id.* ¶ 210. Plaintiff's mother and stepfather described Scanlan's behavior, including the fact that he broke her cellphone, to which Nugent responded that he was not aware of the details of the incident. *Id.* ¶ 213.

The next day, on April 28, 2021, Johnson-Willis reached out to Doe via email about moving forward with a Title IX complaint. Am. Compl. ¶ 197. Plaintiff responded that she was not comfortable moving forward due to the requirement that she would appear in front of him, and that she would fully cooperate with Syracuse U's own Title IX complaint against him. *Id.* ¶ 198. Plaintiff received a "Notice of Investigation" detailing her disclosures to

Syracuse U, and that Johnson-Willis had initiated a formal complaint with the Title IX Office.[7]  *Id.* ¶¶ 199, 201.

On April 30, 2021, Doe's mother and stepfather joined a video-call with Wildhack and Nugent in response to an email plaintiff's mother sent expressing concern about how Syracuse U was handling the situation.  Am. Compl. ¶ 217.  Wildhack and Nugent assured plaintiff's mother and stepfather that should she return to campus, Syracuse U could provide safety monitoring and escort services for her to prevent contact with Scanlan.  *Id.* ¶ 219.

Scanlan was arrested on May 7, 2021, on charges related to the domestic violence incident with Doe.  Am. Compl. ¶ 242.  On the same day, the Onondaga County Criminal Court issued an order of protection on behalf of Doe against Scanlan.  *Id.* ¶ 245.  The Syracuse Police Department and Onondaga District Attorney were not notified of the incident until over a week later.[8]  *Id.* ¶¶ 153, 154, 155.

---

[7]  Doe's disclosures included Scanlan pushing her to the ground, stalking her, stealing her personal belongings, and the domestic violence incident on April 18, 2021, including breaking the phone and the physical assault.  Am. Compl. ¶ 202.

[8]  There were no members of the Syracuse Police Department present at the scene of the cellphone incident, nor was notification made to them before responding to the domestic violence call.  Am. Compl. ¶¶ 113–14.

## III.  **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must be enough to elevate the plaintiff's right to relief above the level of speculation.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  So while legal conclusions can provide a framework for the complaint, they must be supported with meaningful allegations of fact.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.

To assess this plausibility requirement, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  In doing so, the court generally confines itself to the facts alleged in the pleading, any documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV.  **DISCUSSION**

Doe's complaint sets forth claims for retaliation under Title IX (Count I) and the New York State Human Rights Law (the "NYSHRL") (Count V), breach of contract (Count VI), negligence (Counts II and III), and negligent infliction of emotional distress (Count IV).  Am. Compl. ¶¶ 370–435.

Defendants have moved to dismiss plaintiff's breach of contract and negligence claims for failure to state a claim.  Defs.' Mem. at 16–31[9]

**A. <u>Negligence</u>** (Counts II and III)

Doe has brought claims of negligence against defendants arising from the domestic violence incident with Scanlan that took place on the Syracuse U campus.[10]  Am. Compl. ¶ 394, 414.  Plaintiff also raises a negligent hiring, retention, and supervision claim.  *Id.*

To bring a negligence claim in New York, a plaintiff must plausibly allege that the defendant owed a duty to the plaintiff, the defendant breached that duty, and an injury proximately resulted from the breach.  *Moore Charitable Found. v. PJT Partners, Inc.*, 217 N.E.3d 150, 157 (N.Y. 2023); *Pasternack v. Lab'y Corp. of Am. Holdings*, 59 N.E.3d 485, 490 (N.Y. 2016) ("In the absence of a duty, as a matter of law, there can be no liability[.]").  Claims for negligent hiring, retention, and supervision also require that the plaintiff plausibly allege the "standard elements of negligence[.]"  *Ehrans v. Lutheran Church*, 385 F. 3d 232, 235 (2d Cir. 2004).

Defendants argue that Doe's negligence claims must be dismissed because she has not plausibly alleged the existence of a special relationship between

---

[9] Pagination corresponds to CM/ECF.

[10] Doe has voluntarily withdrawn her negligent infliction of emotional distress claim.  Pl.'s Opp'n. at 9 n.4.  Therefore, that claim will be dismissed.

herself and defendants or that defendants breached a duty owed to plaintiff. Defs.' Mem. at 19–20.  Doe responds in opposition that defendants owed her a special duty of care because it was acting as her landlord while she was living on campus and because Syracuse U had control over her and Scanlan as student-athletes.  Pl.'s Opp'n at 14–22.

As an initial matter, Doe's argument that Syracuse U owed a special duty merely because it was acting as a landlord is unavailing.  It is true that as an on-campus student, Syracuse U was effectively plaintiff's landlord. *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 117 (2d Cir. 2006).  Syracuse U was responsible for maintaining safe and secure entrances to their student housing.  However, like any landlord, Syracuse U was not responsible for the independent tortious acts of its tenants against other tenants.  *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021) (holding that a landlord "has no duty to prevent one tenant from attacking another tenant unless it has the authority, ability, and opportunity to control the actions of the assailant.").

Importantly, Doe has not alleged that Syracuse U failed to maintain or keep its student housing safe from intruders.  Nor has she specifically alleged that Scanlan was ever an "intruder."  Am. Compl. ¶ 72.  Rather, plaintiff alleges that prior to the first incident, she let Scanlan—a Syracuse U student—into her apartment voluntarily.  *Id.*  Plaintiff also alleges that the

second incident took place in Scanlan's own apartment, where he was also not plausibly an intruder.  *Id.* ¶¶ 83–84.  Therefore, plaintiff has not plausibly alleged that Syracuse U breached its duty as a landlord.

Doe's argument that Syracuse U nonetheless owed her a duty of care to keep her safe because of its authority over its students also fails.  In New York, "[t]he common law does not ordinarily impose a duty to prevent third parties from injuring others unless the defendant has the authority to control the conduct of such third parties."  *Id.* at 81.  Typically, schools enjoy this kind of authority over their students.  Under the *in loco parentis* doctrine, schools step into the shoes of a parent assuming custody of their students and thus, assume the same duty of care as a reasonably prudent parent.  *Mirand v. City of New York*, N.E.2d 263, 266 (N.Y. 1994); *Hammond v. Lincoln Tech. Inst., Inc.*, 2012 WL 273067, at *7 (E.D.N.Y. Jan. 30, 2012).  But the *in loco parentis* doctrine does not extend to colleges and universities.  *See, e.g.*, *Eiseman v. State*, 70 N.Y.2d 175, 190 (N.Y. 1987); *Annabi v. N.Y. Univ.*, 2023 WL 6393422, at *17 (S.D.N.Y. Sept. 29, 2023) (citing *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 374 (S.D.N.Y. 2016)); *Brown v. Univ. of Rochester*, 189 N.Y.S.3d 801, 805 (N.Y. App. Div. 2023).

However, colleges and universities do assume a duty to its students to prevent foreseeable harm.  *Brown*, 189 N.Y.S.3d at 802–03.  In *Brown*, the plaintiff alleged that in addition to her own complaints, the university

14

"received credible reports" about various drugging and sexual assaults of students occurring in an on-campus fraternity house but did not notify authorities or conduct any investigations.  *Id.* at 802–03.  The Appellate Division held that the plaintiff in *Brown* had plausibly alleged that the university had breached its duty to its students when it failed to curb the "*ongoing and pervasive* criminal conduct" by not taking "appropriate responsive action."  *Id.*

Measured against this standard, however, Doe has not plausibly alleged that defendants were aware of any ongoing criminal conduct against other students.  Plaintiff alleges that she disclosed only one report of a physical altercation between Scanlan and another lacrosse player to defendants prior to the incident.  Am. Compl. ¶ 42.  Plaintiff alleges that she informed defendants of other complaints against Scanlan only after the incident occurred.  *Id.* ¶ 164.

Therefore, Doe has not plausibly alleged that defendants breached their duty of care to her by failing to prevent any foreseeable harm; i.e., the incident between plaintiff and Scanlan.[11]  Accordingly, defendants' motion to dismiss plaintiff's negligence claims must be granted.

---

[11]  Doe has failed to respond to defendants' arguments to dismiss her claims against the individual defendants for negligent retention, supervision, and hiring in opposition papers.  While the court recognizes that "[a] plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal[,]" *McCall v. Pataki*, 232 F.3d 321, 323 (2d Cir. 2000), upon review, the negligent retention, supervision, and hiring claims against defendants Desko, Wildhack, and Keenan-Kirkpatrick are

**B.  <u>Breach of Contract</u>** (Count VI)

Doe has also asserted a breach of contract claim against defendant Syracuse U for failing to adhere to the terms of its Title IX Policy ("The Policy").  Am. Compl. ¶¶ 427–35.   Defendants argue that plaintiff's breach of contract claim should be dismissed because she has failed to plausibly allege the existence of sufficiently specific terms, or that defendants breached those terms.  Defs.' Mem. at 16.

New York courts have long recognized the existence of an implied contractual agreement between students and their universities by nature of accepting an offer of admission.  *Carr v. St. John's Univ.*, 231 N.Y.S.2d 410 (N.Y. App. Div.), *aff'd*, 187 N.E.2d 18 (N.Y. 1962); *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 358 (N.D.N.Y. 2014); *Tapinekis v. Pace Univ.*, 2024 WL 2764146, at *1 (2d. Cir. May 30, 2024) (summary order).  To bring breach of contract claim under New York law, a plaintiff must allege "(1) [the] existence of an agreement; (2) adequate performance of the agreement by plaintiff; (3) breach of the agreement by the defendant; and (4) damages resulting from the breach."  *Ford v. Rensselaer Polytechnic Inst.*, 507 F.

---

dismissed for reasons substantially argued by the defendants in their reply: plaintiff alleges in her amended complaint that the individual defendants were acting within the scope of their employment.  Defs.' Mem at 19–20; Am. Compl. ¶ 405.  This theory also underpins plaintiff's *respondeat superior* negligence claim (Count III), which is accordingly dismissed.

Supp. 2d 406, 413 (N.D.N.Y. 2020) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d. Cir. 1996)).

As relevant here, the terms of the contract are furnished by "the university's bulletins, circulars and regulations made available to the student." *Papelino*, 633 F.3d. at 93; *Nieswand v. Cornell Univ.*, 692 F. Supp. 1464, 1471 (N.D.N.Y. 1988) (holding that sections of brochures given to students pertaining to residence hall security were terms of the implied contract between the university and student).

But only "specific promises" contained in those materials form the contract are considered actionable terms of the contract. *Doe v. Siena Coll.*, 2023 WL 197461, at *17 (N.D.N.Y. Jan. 1, 2023) (citing *Nungesser*, 169 F. Supp. 3d at 370); *Lloyd v. Alpha Phi Alpha Fraternity*, 1999 WL 47153, at *10 (N.D.N.Y. Jan. 29, 1999). For instance, general promises to adhere to state or federal law are not sufficiently specific to form the basis for a breach of contract claim. *See Siena Coll.*, 2023 WL 197461, at *17; *Rolph v. Hobart & William Smith Coll.*, 271 F. Supp. 3d 386, 406 (W.D.N.Y. 2017).

Courts in this Circuit have routinely rejected breach of contract claims against universities based on such vague commitments. *See, e.g.*, *Doe v. Trustees of Hamilton Coll.*, 2024 WL 1675130, at *8 (N.D.N.Y. Apr. 18, 2024); *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 208 (S.D.N.Y. 1998) (concluding that a university provision claiming that "all students should receive fair and

equal treatment" was too general to form a contractual obligation);

*Nungesser*, 169 F. Supp. 3d at 370 (rejecting a commitment to "providing an

environment free from gender-based discrimination and harassment" as

specific enough to create a contractual obligation); *Noakes v. Syracuse Univ.*,

369 F. Supp. 3d 397, 420 (N.D.N.Y. 2019) (holding that a provision

stipulating students would be treated in a "fundamentally fair" manner was a

non-actionable policy statement); *Doe v. Rochester Inst. of Tech.*, 2024 WL

1051953, at *7 (W.D.N.Y. Mar. 11, 2024) (holding that a university's

adherence to a preponderance-of-the-evidence standard in its disciplinary

proceedings was sufficiently "express and specific" to be the basis of a breach-

of-contract claim); *see Faiaz*, 64 F. Supp. 3d at 359–60.

Defendants argue that the Doe has failed to allege the existence of specific

promises found in its on-campus bulletins, or elsewhere, that would create a

contractual obligation.  Defs.' Mem. at 16–20.  In opposition, plaintiff argues

that she has plausibly alleged that defendant breached the terms of both the

Policy and Student Handbook.  Pl.'s Opp'n. at 22–23.

Upon review, Doe has plausibly alleged that Syracuse U breached the

terms of the parties' implied contract.  Doe has identified two specific

promises that were allegedly breached: (1) provisions of the Student

Handbook regarding the issuance and recission of No Contact Orders

("NCOs"); and (2) portions of the Memorandum of Understanding ("MOU")

between Syracuse U Department of Public Safety ("DPS") and the Syracuse Police Department.  Am. Compl. ¶¶ 61, 151.

### 1.  <u>The Student Handbook</u>

Turning first to the Student Handbook, Doe has identified sufficiently specific terms.  The Student Handbook states that "[NCOs] will not be considered for removal or amendment if all elements of the written appeal are not addressed or *if there is evidence of the potential for future negative incidents between listed parties*."  Am. Compl. ¶ 61 (emphasis added).

This language is not a broad or general provision.  *See Trustees of Hamilton Coll.*, 2024 WL 1675130 at *9 (citing *Rochester Inst. of Tech.*, 2024 WL 10519353, at *7).  Rather, this language constitutes a specific promise regarding the removal or amendment of NCOs issued to Syracuse U students.  *See id.*

Doe further alleges that she reported a past incident of domestic violence involving Scanlan and herself to a Title IX Coordinator.  Am. Compl. ¶ 53.  Therefore, it is plausible that Syracuse U breached the terms of the  Student Handbook when it removed the NCO between plaintiff and Scanlan, despite its alleged knowledge of a past incident between the two.

### 2.  <u>The Policy</u>

Next, Doe has plausibly alleged the existence of specific terms of The Policy: the Policy stipulates that "[Syracuse U] will report allegations of

criminal conduct and potential criminal conduct to the appropriate local law enforcement, consistent with the terms in the University's Memorandum of Understanding with the Syracuse Police Department."  Am. Compl. ¶ 321.

The MOU provides that DPS is required to "make additional mandatory notifications to SPD's Abused Persons Unit (APU) and the DA's Office in cases of violations, misdemeanors, and felonies related to sexual abuse/deviance or domestic violence" and that responding to a violation of "any law relating to domestic/relationship violence . . . shall be coordinated with SPD's Abused Persons Unit (APU)."  Ex. 3 to Pl.'s Opp'n, Dkt. No. 62-3 at 4.  The MOU further provides that "DPS will *immediately* notify SPD's CID Desk of any other criminal act or event of a serious nature[,]" and that DPS notifications to the APU and the DA about domestic violence would be "in addition to notifying SPD's CID Desk[.]"[12]  *Id.* at 6 (emphasis added).

These terms also constitute sufficiently specific promises on the part of Syracuse U to report on-campus domestic violence.  Plaintiff further alleges

---

[12]  Defendants argue that because the MOU itself excludes any third-party beneficiaries, Doe cannot enforce this provision.  Defs.' Reply Mem. at 7.  However, the incorporation of the MOU into the Title IX Policy establishes the University's reporting standards as a term of Syracuse U's implied contract with Doe, of which she is a direct party to, not a third-party beneficiary.  *Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 517 (S.D.N.Y. 2020).  Defendants argue that if the Student Handbook incorporated the MOU, it incorporated all of its terms—including the terms excluding third-party beneficiaries.  Def's Reply Mem. at 7.  However, when one document incorporates another document, it does so only for the purpose that the document is designated for in the contract.  *Miller*, 291 F. Supp. 3d at 518 (collecting cases).  The purpose of this document's incorporation is to stipulate Syracuse U's reporting obligations, so the relevant provisions related to reporting are thereby incorporated.

that SPD and the DA were not notified of the alleged Scanlan assault until a week later.  Am. Compl. ¶ 153–54.

Therefore, Doe has plausibly alleged that Syracuse U breached portions of the Policy.  Accordingly, defendants' motion to dismiss plaintiff's breach of contract claim will be denied.

## C. **Leave to Amend**

As a final matter, Doe has requested leave to amend her complaint.  Pl.'s Opp'n. at 31.  Plaintiff argues that is at an informational disadvantage as a college student opposing a large university.  *Id.*

Rule 15(a)(2) states that leave to amend should be freely given "when justice so requires."  FED. R. CIV. P. 15(a)(2).  However, courts may deny leave to amend due to "repeated failure to cure" or futility.  *MSP v. Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F. 4th 77, 90 (2d Cir. 2023).

In addition, Local Rule 15.1(a) requires a party seeking leave to amend to submit a copy of the proposed pleading "such that the court may consider the proposed amended pleading as the operative pleading."  N.D.N.Y.L.R. 15.1(a).  The local rules aim to not only economize the Court's busy civil docket but reflect this Circuit's preference to determine futility based upon the proposed amendments.  *See In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th at 175.

Upon review, leave to amend will be denied.  Doe has already amended her pleading once.  Plaintiff has not offered any particular basis on which to

believe an amendment should be granted.  She has also failed to comport with the Local Rules which preclude the Court from evaluating the sufficiency of any proposed amendment.  Therefore, plaintiff's request for leave to amend will be denied.

## V.  **CONCLUSION**

Doe's negligence claims do not survive this motion to dismiss because she has not plausibly alleged the required elements of duty and breach.  Thus, plaintiff's negligence claims will be dismissed.  Similarly, plaintiff was unable to plausibly allege either the existence of a specific duty of care, or that defendants' conduct was unreasonable.  Accordingly, plaintiff's NIED claim fails as well.

However, plaintiff's breach of contract claims survives.  Plaintiff has plausibly alleged the existence of specific terms found in the Student Handbook and the Policy as well as defendants' breach of those terms.

Therefore, it is

ORDERED that

1.  Defendants' motion to dismiss is GRANTED in part and DENIED in part; and

2.  Defendants' motion to dismiss plaintiff's negligence claims (Counts II and III) is GRANTED;

3.  Defendants' motion to dismiss plaintiff's NIED claim (Count IV) is GRANTED;

4.  Defendants' motion to dismiss plaintiff's breach of contract claim (Count VI) is DENIED;

5.  Defendants are directed to file and serve an answer to plaintiff's Title IX (Count I), NYSHRL (Count V), and breach of contract (Count VI) claims on or before August 12, 2024.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  August 2, 2024
        Utica, New York.